## UNITED STATES v. GRAVES.

### (District Court, N. D. Iowa, E. D. December 17, 1892.)

1. NATIONAL BANKS—REPORTS TO COMPTROLLER—"FALSE ENTRIES."
    A "false entry" in a report by a national bank officer or director to the comptroller of the treasury, within the meaning of Rev. St. § 5209, is not merely an incorrect entry made through inadvertence, negligence, or mistake, but is an entry known to the maker to be untrue and incorrect, and by him intentionally entered while so knowing its false and untrue character.

2. SAME.
    A national bank is not required to conform the headings of the various accounts on its books to any prescribed names, nor to the names stated in the form of report prescribed by the comptroller; and therefore when a report is called for, if the person making it enters under the headings in the prescribed form a statement of the bank's condition, which is true in respect to the headings in said form, he has fulfilled the demands of the law.

3. SAME—REPORT OF LOANS AND DISCOUNTS.
    The entry of "Loans and Discounts" in reports to the comptroller does not guaranty the solvency of the makers of the paper, but is a statement that in truth and fact at the date named in the report the bank actually held and owned "Loans and Discounts" to the aggregate so reported.

4. SAME—FALSE ENTRIES.

It is not making a "false entry," within the meaning of the statute, to enter in such report, under heading of "Loans and Discounts," items which, on books of the bank, and for convenience of its officers, have been temporarily withdrawn from that heading, and which are, from day to day, carried on books of the bank under heading of "Suspended Loans," while awaiting action of directors as to same being withdrawn from character of loans, and entered up as a loss on profit and loss account.

5. SAME.

In determining whether the entry, under heading of "Loans and Discounts" in such report, of certain corporation bonds, which were secured by mortgage, and owned by the bank, was the making of a "false entry," within the meaning of the statute, the jury may consider the fact that on the prescribed form of report, after a heading of "U. S. Bonds," there is a heading of "Other Stocks, Bonds," etc., and that, in the report made, certain other corporation bonds, owned by the bank, in large amounts, were entered under the latter heading.

6. SAME—OVERDRAFTS.

Where the form of report as prescribed by the comptroller contains heading of "Loans and Discounts," and also of "Overdrafts," it is the duty of the bank officer to make his entries in such report in such manner that each of these headings shall truthfully state the condition of his bank as to such heading; and he is not justified in entering overdrafts which are being carried on the books of the bank as "Overdrafts" as "Loans and Discounts," merely because he regards an overdraft as a temporary, indefinite loan, nor because these two headings are both found among the "Resources" of the bank; but he should report the overdrafts which are carried on the books of the bank as "overdrafts" in the heading of "Overdrafts," and thereby correctly show the character of the bank's resources in this particular.

7. SAME—PROVINCE OF JURY.

In determining whether defendant made a "false entry," within the meaning of the statute, when he included in such report, as "Loans and Discounts" of the bank, amounts which were being carried on the books of the bank as "Overdrafts," the jury will not consider whether other national banks followed the same practice. Such practice, if it existed, would not change defendant's statutory duty; but the jury, in determining whether such entry, if a "false entry," was made with intent to deceive and defraud, may consider whatever knowledge defendant is shown to have had as to practice of any other national bank in this respect.

8. SAME—LIABILITY OF DIRECTORS.

A director of a bank is personally liable to the bank on paper made to it by a firm of which he is a member, and, in making a report of the condition of the bank to the comptroller, the amount of such paper should be entered under the heading of "Liabilities of Directors (Individual and Firm) as Payers;" and, in determining whether the omission of such an item from this heading was made with intent to deceive, etc., the jury may consider what effect, if any, upon defendant's action in this respect, was caused by the receipt of a letter from the comptroller, prior to the making of the report, calling the attention of the bank officials to the excessive amount of the loans made by the bank to its directors, and demanding immediate reduction thereof.

9. SAME—INTENT—EVIDENCE.

In determining whether a certain false entry, made by a national bank officer in a report to the comptroller, was made with intent to deceive or defraud, etc., within the meaning of the statute, the jury are authorized to infer the intent if the natural and legitimate result of such "false entry" would be to deceive any other officer or officers of the bank, or any agent appointed to examine into its affairs.

10. SAME—ELEMENTS OF OFFENSE.

It is not necessary, to complete the offense of making a "false entry" in a report to the comptroller of the treasury of the condition of a national

bank, with intent to deceive or defraud, that any person shall have been in fact actually deceived or defrauded; for the making of such a "false entry" with the intent to deceive or defraud is sufficient.

11. CRIMINAL LAW—REASONABLE DOUBT.
A "reasonable doubt," as known to the criminal law, is an honest, substantial misgiving, generated by insufficiency of proof; not a captious, doubt, nor a doubt suggested by ingenuity of counsel or jury, or born of a merciful inclination to permit defendant to escape conviction, or prompted by sympathy for him or those connected with him; and where the jury have an abiding conviction of the guilt of the accused,—such a conviction as they would be willing to act upon in the more weighty and important matters relating to their own affairs,—then they have no reasonable doubt.

At Law. Indictment of Rufus E. Graves under Rev. St. § 5209, for making false entries in reports to the comptroller of the currency of the condition of a national bank of which he was president and director. Verdict and judgment against defendant.

M. D. O'Connell, U. S. Dist. Atty., (William Graham, special counsel,) for the United States.

C. C. Cole and Powers, Lacy & Brown, for defendant.

WOOLSON, District Judge, (charging jury.) I congratulate you that your labors in this case are so nearly ended; and I desire to assure you that the court heartily appreciates your prompt and interested attendance, and the careful attention you have given to the evidence as it has been introduced before you during this lengthy trial. Thus far your conduct has abundantly justified the system of jurisprudence which has as one of its most valued elements the trial by jury. In every civilized land the right of any man, charged with crime, to a trial by jury, is held sacred. In this great nation of ours, this sacred right is assured by the fundamental law of the land, our national constitution; and I hold it to be as much the duty of a good citizen to serve his country in time of peace, when summoned to act in the capacity of juror, as it is a good citizen's duty to respond to her call when her safety and honor are imperiled by domestic violence, or her flag assailed by a foreign foe. So long as the intelligent citizenship of the nation, with a courage which dares rightly to decide, and an integrity which cannot be cajoled or corrupted from a true verdict, shall constitute the juries of our courts, so long may we confidently expect our courts shall be the protection of innocence and the terror of evil doers.

In the system of jurisprudence obtaining with us, a trial, in cases like the one now on hearing, has a twofold division, each part having its separate duty to perform. The court is charged with the duty of determining the law governing the case, and of superintending the admission of evidence upon which the facts involved are to be decided, while the jury is charged with the duty of deciding the facts as the evidence shall enlighten them. You will thus observe that the jury is a most important arm of the law in the administration of our criminal jurisprudence, and that the efficiency of that jurisprudence depends no less on the faithful and honest action of the jury than upon the honest and intelligent action of the court. In-

deed, as a general statement, it is unquestionably true that with the juries of our country, even in a larger degree than with the judges of our courts, rests the responsibility of determining whether the laws shall be obeyed, and their violations punished. The judge, however heartily he may desire the law enforced and crime sent to its deserved punishment, is powerless to convict the criminal unless the jury shall join in that desire, and return their verdict of guilty, when crime has been proven before them; so that the honest jury not only stand as a bulwark against unjust punishment of innocent men, but as well the protection of the nation against freedom to crime and impunity to criminals. When, therefore, judge and jury unite in earnestly upholding the law and punishing its violation, honest men are safe, while crime-committers are made to tremble.

By the oaths you have taken, you are bound a true verdict in this case to render, on the evidence introduced before you, applying thereto the law as it shall be given you by the court. As a jury, you are to be no respecter of persons. Whether the defendant has high social standing and influence and wealth, and be entrenched with powerful friends, or. possesses none of these desirable conditions, but, instead, be a man of low degree and acquainted with poverty, he is to receive at your hands the same honest, intelligent, courageous consideration, with reference to the facts proven. See to it, gentlemen, that as you expect to answer at the last great day, when the secrets of all hearts are made known, see to it that your consciences shall discharge you in this case, in the sincere and impartial performance of your duty, from the obligations of the oaths you have taken.

The court is no less bound to impartially administer the law. Every judge of a United States court, as he enters upon his office, is sworn thus to discharge his duties. Let me read to you what that oath is:

"I do solemnly swear that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties devolving on me according to the best of my abilities and understanding, agreeably to the constitution and laws of the United States, so help me God."

By this oath the judge is bound to see that justice is administered, and that the right prevails. I can say to you, gentlemen, without reservation, that this has been my sole wish and desire in this trial, now so near its close.

The defendant, Rufus E. Graves, stands charged with having violated the law relating to his duty as president and director of a national banking association, viz. the Commercial National Bank of Dubuque, in that he made certain false entries in certain reports to the comptroller of the currency. In your investigations in this case, bear constantly in mind, gentlemen, that the defendant is not upon trial upon any charge of embezzling or misapplying funds of the bank, nor upon any charge of having by himself, or with others, plundered or wrecked the bank; and you cannot base your verdict herein upon any other charge than that set forth in the counts of the indictment submitted to you. The indictment confines this trial to

the matters of alleged false entries, averred to have been made with intent to defraud or deceive, as charged. And whether the defendant did or did not properly manage or direct, or assist in managing or directing, the general affairs of the bank, and whether or not said bank failed, are matters wholly immaterial in this trial, except in such particulars as may in these instructions be treated upon and applied to the charge of making said false entries, and only so far as the same may be so treated and applied as bearing on the intent of the defendant.

The national banking act is of comparatively recent enactment. The system of national banks grew out of the necessities of our nation during the war of the Rebellion. At a period in that terrible and costly war when the armies of the nation were in the field and its navies rode the waves, when revenue greatly in excess of that coming into the national treasury became absolutely necessary to the maintenance of our armed forces and of the government at home and abroad, —at a time when the very existence of the nation, and the suppression of the armed foes warring upon it and assailing our flag, seemed almost to depend on the power of the government immediately to provide greatly enlarged financial resources,—the financial statesmen of the nation devised this plan, which, with subsequent amendments, has crystalized into the present national banking law. I but voice the general sentiment of every man who has carefully investigated the present national banking system when I state that it is one of the best, if not the best, banking system the human intellect has ever devised. It is rightly called a "national" banking law. Having its inception in the necessities of the nation, and its foundation in the statutes enacted by the national lawmaking power, congress so broadly laid its foundation that it applies and extends to the farthest boundaries of the nation, and yet is at the very door of any community desiring to avail itself of the benefits found in the system. And congress, intending it should be national in extent, has placed it under national, or, as the term is sometimes used, federal, charter and federal supervision; so that this system is under federal, as distinguished from state, supervision. Upon the courts of the United States, and not upon the courts of the several states, is conferred the duty and power of investigating and punishing crimes or violations of the provisions of this law.

Anticipating that in almost every settled part of the nation these national banking associations would spring up, as their security and desirability should be made manifest, congress carefully surrounded these associations by every barrier against dishonesty, fraud, and corruption which the ingenuity of its members could devise; for it was apparent that into the treasuries of these national banks would be deposited, not only the surplus of the capitalist, but as well the hard-earned wage of labor. Disaster befalling one of these banks must of necessity bring close in its train widespread ruin in the community; business men and business enterprises whose financial interests were involved in these banks would go down with the bank; and the savings of years of self-denial, the dependence of the widow and the support of the orphan, would be swept away in the common

disaster. Recognizing that, when prudent and conservative management controls a national bank, failure is improbable, and dishonesty in bank management rarely fails to work the bank's downfall, and that the task is extremely difficult to provide by law against the fraud and corruption of designing men, congress wisely enacted laws of a most stringent character, whereby they hoped to prevent malfeasance in bank management; and congress therein provided for the punishment of those bank officials and employes who, forgetting the high trust placed within their charge, plundered the funds they were set to guard, and wrecked the banks they had been selected and had sworn to conserve and protect.

In addition to the financial responsibility imposed by the statute upon the individual stockholders, which in general may be stated to be substantially to the extent of the par value of the shares held by them, outside of and beyond the actual value of their interest in the bank, the officers of the bank are laid under stringent and sharp criminal responsibility. Upon the directors the statute confers the management and control of the bank, and the law wisely holds them to a close and careful attention to their duty. Every director, upon entering upon his office, is reminded of his duties by the oath he is compelled to take and subscribe, and his term of office is but for the banking year. Thus in each year the directors are brought before the stockholders to an annual responsibility, and, though re-elected, the oath must be taken at each election anew. This oath—and I give it in part, that it may be seen how powerful is this annual reminder—is in substance as follows: That he will, so far as the duty as director devolves upon him, diligently and honestly administer the affairs of the bank of which he has been elected a director, and will not knowingly violate, or willingly permit to be violated, any of the provisions of the law relating to national banks. And this oath is forwarded to the comptroller of the currency, and filed and preserved in his office,—an oath which, if observed in its letter and spirit, will make reasonably certain the permanent prosperity of the bank, and assure the safety and security of all who shall confide their means to the bank's keeping.

The comptroller of the currency is charged with the general supervision of the bank, and he is clothed with plenary power and authority over it, and over its officers and directors; and it is his imperative duty, whenever he shall find a bank persistently following such plans, or conducting itself in such manner, as shall imperil the safety of those interested therein or the security of the bank's depositors,— the statute makes it his imperative duty,—to wind up such bank, and preserve for those entitled thereto whatever value may belong to such bank. Accordingly, the law provides that at least five times during the year, and on dates that may be fixed by the comptroller, every national bank shall make to the comptroller accurate and truthful reports of the condition of the bank, exhibiting in detail and under appropriate heads the resources and liabilities of the bank, in such form as he shall prescribe. These reports must be verified by the oath of the president or cashier of the bank, and must be attested as being correct by the signatures of at least three

of its directors. These reports are to be of the condition of the bank upon some day then past when the report is required; that is, a report is never called for as of some date after the bank is notified to report; else the bank, warned of the fact that its condition on such future day is to be forwarded, might manipulate its condition, might temporarily swell its assets and reduce its liabilities, for the purpose of presenting a report which, under such careful trimming, would be acceptable to the comptroller, but would in fact not be the accurate showing of the bank's true condition. And so, whenever a report is demanded by the comptroller, the directors of the bank are compelled to turn back the pages of its journal and other records, and report what was the condition of the bank upon some past day; and thus, having no notice or warning what past day will be selected, the bank officials, it was naturally to be expected, would exercise greater care to have its banking house in all particulars constantly kept in order and ready for inspection.

The records of this bank in evidence, as the same have at different times been referred to in the course of the trial, have shown to you the fact that at the close of each day's business the books of the bank are practically balanced, and each account therein closed for the day, and all entries therein carried out into such footings or statements as that, upon a moment's inspection, a person familiar with banking methods can give the exact condition of any depositor's account, or the exact condition of any item which has entered into the business of the bank, on that or any former day. You have seen the president of the bank and its cashier thus, without hesitation, turn in your presence to its records whenever a question relating thereto has been asked, and give you the condition as carried on these books of any discount or depositor's account or the like, at any date inquired after, whether the date was that of any of the reports introduced in evidence, or a date years prior thereto. Now it is this very matter I have been considering which gives to these reports so made to the comptroller their value, and enables him, when these reports are accurately and truthfully made, to determine therefrom, as he might have determined from a personal inspection of the books of the bank, the general condition of the bank, and whether it is apparently safe and secure to those dealing with it, and whether it is under conservative, prudent, and safe management.

The statute further provides, for the purpose of giving information to those specially interested and the public generally, that these reports shall be published in the same general form in which they are made and forwarded to the comptroller; and thus it is possible for all who examine these published reports to have general knowledge of the condition of the bank and on the same points made known to the comptroller. These suggestions emphasize the wisdom of the law in compelling truthful and accurate reports from the bank. If the accounts are not truthful and accurate,—in other words, using a phrase which has come into quite general use and common understanding, if these accounts, as borne on the books of the bank, are "doctored," and the condition of the bank as to the daily balances and footings are so changed when entered into these reports as that they

are not truthfully and accurately reported,—a deceit may be practiced on the comptroller in the reports submitted to him, and on the parties interested, and on the public in the community where these reports are published. And this the statute condemns, and for such deceit the statute provides that severe punishment shall be visited upon the guilty parties.

The statute, in requiring that these reports shall be truthful, does not require any difficult task of the bank officials. A substantial synopsis of the aggregates or footings as contained in the books of the bank at the close of any day's business is easily made; and an inspection of the books in evidence, and a comparison of them with the printed part of the reports which have been introduced before you, will show that the books of this bank were kept in substantial accord with the general tenor of the demands made by the comptroller for information, and that, in the more material features of these reports, the total footings on any date called for could have been copied from the books of the bank right into these reports, and thus the accurate and truthful condition of the bank, as shown by its books, would in these points be in possession of the comptroller and all persons interested. So important does the law regard the necessity of these reports being accurate and truthful that section 5209 of the Revised Statutes of the United States declares that "every president, director, cashier, teller, clerk, or agent of any such banking association, * * * who makes any false entry in any * * * report * * * of the association, with intent * * * to injure or defraud the association, or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association, * * * shall be deemed guilty of a misdemeanor," and punishment is provided accordingly. Another section of the law provides that the comptroller shall with the approval of the secretary of the treasury, and as often as shall be deemed necessary, appoint suitable persons to make examinations of the affairs of the national banks; and these examiners are empowered to make thorough examination into the affairs of the bank, and to examine bank officials upon their oaths, and report in detail to the comptroller the condition of the bank examined.

The indictment in this case, as originally presented, contained 16 counts, but the court has stricken out some of the counts, and now strikes out all the counts except the 4th, 5th, 7th, 8th, 9th, and 10th counts. You will therefore understand, gentlemen, that all the counts of said indictment have been and now are withdrawn from your consideration, except the six counts above specifically named, and you will confine your deliberations to the said six counts, and will consider no others. I will now proceed to state to you what these six counts charge against defendant, as to which counts, and no other counts, you are to determine by your verdict the guilt or innocence of defendant.

The fourth count charges that on the 5th day of August, 1887, the defendant was president of and a director of the Commercial National Bank of Dubuque, which bank was at that date a banking association

organized and existing under the laws of congress; that upon said 5th day of August, in a report made to the comptroller of the condition of said bank at the close of the day's business for the 1st day of August, 1887, said defendant made a certain false entry, in that he therein stated that the overdrafts due said bank aggregated, on said August 1, 1887, the sum of $2,948.58, whereas it is alleged that, in truth and in fact, the overdrafts on that day due to the bank exceeded by many thousands of dollars said amount so stated in said report; that said defendant, at the time he made said false entry, well knew the same was false; and that defendant made the same therein, with the intent to deceive the officers of said bank, and to deceive any agent then appointed, or that might be thereafter appointed, to examine the affairs of said bank, and with the intent to defraud said bank, and other corporations, firms, and persons then doing, or who might thereafter do, business with said bank.

The fifth count charges that defendant, in said report at close of the day's business of August 1, 1887, of said bank, made therein a certain false entry, wherein he stated that on said August 1, 1887, the liabilities to said bank of its directors (individual or firm) as payers were $65,000, whereas in truth and in fact said liability to said bank of said directors was many thousands of dollars greater than as stated in said entry; that said defendant well knew said entry to be false, and made said entry with intent to deceive and defraud, as I have stated same in regard to said fourth count.

The ninth count charges that defendant, in said report to comptroller at close of the day's business of August 1, 1887, made a certain false entry, wherein he stated that the loans and discounts held and owned by said bank aggregated the sum of $551,048.60, whereas in truth and in fact the aggregate of loans and discounts held and owned by said bank at close of business on said August 1, 1887, was many thousands of dollars less than said sum in said report stated, as defendant well knew; and that defendant made said false entry with intent to deceive and to defraud, as above stated as to fourth count.

The seventh count charges that on October 10, 1887, the defendant then being the president of and a director in said bank, in a report to said comptroller of the condition of said bank at the close of business upon October 5, 1887, made a certain false entry, viz. that he therein stated the overdrafts due to said bank aggregated the sum of $5,344.60, whereas in truth and fact at said time the overdrafts due the bank aggregated a sum by many thousands of dollars larger than as so stated, as defendant then well knew, and that defendant made said false entry with intent to deceive and to defraud, as above stated as to fourth count.

The eighth count charges that in said report to said comptroller of the condition of said bank at close of business on October 5, 1887, defendant made a certain false entry, viz. that he therein stated liabilities of directors (individual and firm) as payers to said bank were $49,867.40, whereas in truth and in fact, as defendant well knew, said liabilities of directors, (individual and firm,) as payers on said date, were many thousands of dollars larger than the sum so stated

in said report; and that defendant made said false entry with intent to deceive and to defraud, as stated above as to said fourth count.

The tenth count charges that in said report to said comptroller of the condition of said bank at close of business upon October 5, 1887, said defendant made a certain false entry therein, viz. that he therein stated the loans and discounts held and owned by said bank aggregated the sum of $491,562.85, whereas in truth and in fact the aggregate of the loans and discounts so at said date held and owned by said bank was many thousands of dollars less than said sum by defendant so stated, as defendant then well knew; and that defendant made said false entry with intent to deceive and to defraud, as stated above as to said fourth count.

Brought down into small compass and in a form easily understood, defendant is charged with having made false entries with regard to the condition of said bank, as to its loans and discounts, as to its overdrafts, and to liabilities due it from its directors (individual and firm) as payers, in each of the reports as to August 1, 1887, and as to October 5, 1887. The jury, as they may find from the evidence, can find the defendant guilty as to all of these six counts, or not guilty as to all of these six counts, or guilty as to one or more of these six counts, and not guilty as to the remaining counts.

To this indictment the defendant pleads not guilty; and this puts in issue every material averment necessary to a conviction. The defendant is by law presumed to be innocent,—that is, he starts into this trial with the presumption of innocence in his favor; and before he can be convicted he must be proven to be guilty beyond a reasonable doubt. And if he is not so proven you must acquit him.

With regard to the crime charged in the various counts submitted to you in the indictment, you will observe that there must be proven herein the following points:

(1) That the Commercial National Bank of Dubuque was at the dates named in the various counts submitted to you a banking association, organized and existing under the statutes of congress providing for a national banking system.

(2) That defendant, Rufus E. Graves, at the dates named in said counts, was the president of said bank and a director therein.

(3) That a report of the condition of said bank was, on one or both of the dates named in said counts, made to the comptroller of the currency.

(4) That said defendant, being at the time the president of and a director of said bank, did make in one or more of said reports to the comptroller a false entry set forth in some one of said counts in said indictment.

(5) That said defendant so made such false entry with the intent to deceive any agent then appointed, or thereafter to be appointed, to examine the condition of said bank, or to deceive some one or more officers of said bank, or with the intent to defraud the said bank, or some other corporation, firm, or person.

And, before the defendant can be found guilty, each of these points must be proven. If any one of them is not proven, the government has not fulfilled the requirements of the law as to proving guilt. In

this case the evidence introduced has proven, without dispute, many of these points. The defendant has testified in his own behalf, and you are authorized to accept as proven herein the first three points, namely: That said Commercial National Bank was organized under said statutes, and was doing business as such national bank upon the several dates named in the indictment; that at said dates defendant, Graves, was the president and a director in said bank; and that reports of the condition of said bank were made upon the dates named in said counts, (and said reports have been introduced in evidence before you.) Defendant has also testified before you that the signature purporting to be his upon said reports is his genuine signature, and he has also testified before you with reference to his having placed the figures in said reports; so that under the evidence you are authorized to accept as proven that defendant did make said reports and the entries therein, set out in those counts in the indict- ment, which are submitted to you for your consideration.

There remain, therefore, for your determination in this case, but two disputed points, upon determination of which depends the verdict you are to render herein; and these points are:

(1) As to the entries, or any of them, with which defendant stands charged, being false entries.

(2) (And if you find that they or any of them are false,) as to their having been made by defendant with intent either—First, to deceive any agent then appointed, or thereafter to be appointed, to examine the condition of said bank, or to deceive some one or more officers of said bank; or, second, to defraud said bank, or some other corporation, firm, or person.

These two remaining disputed points I will consider in the order just named. And first as to the false entry: I have to say to you that the term "false entry," as used in this statute, when taken with its connecting words means more than simply an untrue or incorrect entry; for congress did not thereby intend a mere mistake as to the entry. Congress did not intend to punish a bank director or bank official who inadvertently, through mistake, or perhaps negligently, 1 vde in a report an entry which, though in fact incorrect or false, w. ' believed by such bank officer to be true. Humanity is fallible. We re all of us frequently making mistakes. An error might occur by \ r placing of figures inadvertently in the wrong column, or a footi' ' of the columns entered might be wrong and in fact false, and be  / ntered, without being known to the official, and without his ir ndi. ; thereby to make a false entry. A mistake thus honestly ide wi.l not expose the maker to punishment under this law. But ne false entry contemplated in this statute is an entry known to the maker to be untrue and false, and by him intentionally entered while so knowing its false and untrue nature.

If, then, you find from the evidence that in either report, that is, the report of the bank's condition on August 1, 1887, or on October 5, 1887, which reports have been introduced in evidence, the entry as to loans and discounts, or as to liabilities of directors (individual or firm) as payers, or as to overdrafts, when therein made by defendant, was untrue and false, and was known to him to be untrue and

false at the time he made it, and, having that knowledge, he entered it therein as being correct and true, then you are authorized to find and conclude that the defendant did, within the meaning of the statute, make a false entry as to the report within which said entry or entries appear; and, as to such false entry or entries so by defendant made, this point will then have been proven against defendant.

The defendant has testified before you with relation to the entries in said reports. The books of the bank relating to the subjects of loans and discounts are in evidence before you. The defendant has testified as to what the books of the bank showed upon these points, as they were then being kept by the bank, and that he knew at the time he made the entries in the reports what the showing was upon these books, as to both loans and discounts and overdrafts. He has stated to you the aggregate of loans and discounts, as shown under such heading on the bank's books at the close of the day's business to which these reports relate, and has stated that he did not enter into said reports, as the aggregate of loans and discounts of the bank on such day, said aggregate loans and discounts as then shown on said bank books. As an illustration of the testimony of defendant, (for defendant has said the same plan was pursued as to the entries as to loans and discounts in each report,) take his testimony as to loans and discounts as entered in the report as to the condition of the bank at the close of its business upon August 1, 1887. The "Loans and Discounts" account, as kept under that heading on the books of the bank, defendant states was at the close of August 1, 1887, the aggregate sum of $490,133.78. The entry made by defendant in the report to the comptroller states the aggregate of loans and discounts at the close of business on that day to be $551,048.60,— a difference of about $60,000 larger, as reported to the comptroller, than was then borne on the books of the bank. The defendant has testified before you how this entry as stated in the report was obtained, and that the items which, as he says, constitute the aggregate report to the comptroller, are as follows:

| | |
|---|---:|
| Loans and discounts, as shown on the books of the bank under that heading | $490,133 78 |
| Suspended loans carried under that heading on the books of the bank | 10,000 00 |
| Investment fund or account | 75,449 82 |
| And to this he has added a portion of the overdrawn accounts of individual depositors of the bank, in an aggregate of | 20,465 00 |
| Making a total of | $596,048 60 |
| Then he deducted, he says, (from this aggregate of what he claims as loans and discounts,) what was carried on the books of the bank, under the heading of "Contingent Fund," in an aggregate of | 45,000 00 |
| This deduction, he says, produced the amount of the entry of loans and discounts, as contained in the report to the comptroller, viz | $551,048 60 |

The question presented for your consideration as to this entry in said report is, is this entry of loans and discounts as contained in

the report to the comptroller, a "false entry," as I have defined that term?

The form of report prescribed by the comptroller as shown in the printed portion of the report of August 1, 1887, as introduced in evidence, does not require that the bank officials shall enter in said report the items called for therein, under the same headings given on the books of the bank. The prescribed form, you will notice, states in its caption that it is a report of the "condition of the bank," and does not pretend to be an exact copy or transcript of the books of the bank under the several headings contained in the prescribed form. Therefore the defendant was not compelled to enter, on the form prescribed for the report, the exact aggregates carried under such several headings on the books of the bank, provided the aggregates entered in said report truthfully state the condition of the bank at the close of the said day's business with regard to the headings under which the entries are made in the report. Let me illustrate this point: This bank appears to have carried on their books from day to day certain loans and discounts under the heading of "Suspended Loans;" and the testimony tends to show that these suspended loans had been theretofore carried on the books under the heading of "Loans and Discounts," but had been withdrawn therefrom as objectionable paper or loans having an improbability of payment, and were temporarily carried under the heading of "Suspended Loans," awaiting the action or decision of the board of directors as to these suspended loans being withdrawn or charged off from the character of loans, and entered up as a loss on the profit and loss account. I do not understand the government seriously disputes the correctness of these suspended loans being placed in and made a part of the loans and discounts entry in the report to the comptroller; for the explanation given would still give these suspended loans the character of loans and discounts, and as being carried on the books of the bank in good faith as a part of their actual loans and discounts, though, as I understand, temporarily, and for the convenience of the bank, entered on its books under another heading, viz. "Suspended Loans." And therefore when defendant added the aggregate of said suspended loans account to the aggregate of loans and discount account, as shown on the books, defendant in so doing did not make a false entry. He believed them to be loans and discounts, and he was justified in so believing, and in good faith so reported them, and under the circumstances did not as to that particular make a false entry. The entry of loans and discounts in reports to the comptroller does not guaranty the solvency of the makers of the paper, but it is a statement that in truth and in fact, at the date named in the report, the bank actually held and owned loans and discounts to the aggregate therein reported.

The evidence does not disclose that any particular method or system of book keeping is demanded of a national bank. It is not required to conform its headings of the various accounts to any prescribed names, nor to the names stated in the form of report prescribed by the comptroller; and therefore when a report is called for, if the person making it enters under the headings in the pre-

scribed form a true statement of the bank's condition on the day called for in respect to the headings in said form, he has fulfilled the demands of the law; and the application of this proposition I have just illustrated, as to the item of suspended loans.

Did defendant make a false entry as to the $75,449.82 which he has termed "investment fund," when he included that in his entry of loans and discounts in this report to the comptroller? The items constituting this aggregate of $75,449.82 have been placed in evidence by defendant. It is shown without controversy that some $60,000 of the bonds of the Iowa Iron Works Company of Dubuque entered into this aggregate called "investment fund," and that these bonds belonged to the bank and were secured by mortgage. You have heard the evidence given, as tending to show why the amount of these bonds were by defendant entered in the reports to the comptroller as being loans and discounts held by the bank. The form prescribed for the report, as it is in evidence, has a heading wherein are to be entered, after entry to be made of United States bonds, "Other Stocks, Bonds, and Mortgages, (market value, see Schedule.)" It would appear that reasonably and naturally all bonds owned by the bank should rightfully have been entered under this appropriate heading. The question arises, why did not defendant enter these $60,000 bonds under that heading? Defendant has introduced evidence on this point, and you are to consider and determine whether these bonds, if correctly entered, would have been entered in the report under the heading of "Other (than U. S.) Stocks, Bonds, and Mortgages," or as the same were actually entered, under the heading of "Loans and Discounts;" and if a correct entry would have placed them under the heading of "Other Stocks, Bonds," etc., then inquire whether the evidence satisfies you of good faith and honest action of defendant in entering such bonds, when reporting to the comptroller, as loans and discounts, or whether, for the purpose of swelling or improperly enlarging his loans and discounts entry to the comptroller, defendant, knowing they properly should have been entered under another heading, intentionally entered them in such report under the heading of "Loans and Discounts." Under all the facts proven, you are to decide whether the claim of the government is correct, that the defendant, in entering in the report to the comptroller these $60,000 bonds as loans and discounts, made a "false entry," within the meaning of that term as I have hereinbefore defined it.

And in considering this matter you may notice that on the first or outside page of this report appears the heading "Other Stocks, Bonds, and Mortgages," and you may further notice that these $60,-000 Iowa Iron Works Company bonds are not there entered, although certain other bonds to the amount of $50,000 are entered under that heading; and there is also entered under that heading of "Other Stocks, Bonds," etc., $8,500 of stock of said Iowa Iron Works Company. Ought these $60,000 to have been entered in this report under heading "Other (than U. S.) Stocks, Bonds, and Mortgages?" If they should have been entered there, and were not there entered, but were entered wrongly under "Loans and Discounts," is any reason

or motive apparent for the incorrect entry, if you find it such? On the other hand, you have the reasons as given by defendant. Do these reasons satisfy you? Do they satisfactorily explain the matter to you, consistent with honest motives in the defendant's action? Or is the contention of the government the more consistent with the evidence introduced and the facts proven, when the government claims that the defendant knew the entry he made was calculated to deceive the comptroller, and make his report state an untrue and false condition of the loans and discounts as being larger than they then actually were, and the reported condition of the stocks and bonds less than they actually were at that time? Did defendant fear that said entry of these $60,000 bonds in the entry of other stocks and bonds would bring upon him the censure of the comptroller, and, for the purpose of avoiding such censure, did defendant omit these bonds from the entry of other stocks and bonds, and enter them therein under head of "Loans and Discounts?" You are to determine these matters from the evidence, and consider any motives which you may find from the evidence influenced defendant in making the entry as he did make it, and, from all the facts proven, determine whether or not defendant made, as to said loans and discounts entry, a "false entry," within the definition of the term as I have heretofore given it to you.

The further question remains as to this loans and discounts entry in the report to the comptroller, did the defendant make a false entry in such report when he entered as loans and discounts the further sum of $20,465, which he has testified before you is composed of part of the overdrafts that day shown by the books of the bank to exist in the accounts of various depositors whose names he has given you? It will be convenient to consider this question in connection with the further charge in the indictment, with reference to said report of August 1, 1887, that defendant made a false entry in said report as to overdrafts. The proof shows that the amount of overdrafts entered in said report was the aggregate of $2,948.38, and defendant has testified before you that the aggregate overdrafts upon that day, as shown by the books of the bank, was the sum of $23,413.38; so that the books of the bank at the close of business on August 1, 1887, show an aggregate of overdrafts in excess of that entered in said report of $20,465; in other words, while the books of the bank, in the progress of their regular keeping from day to day, showed the accounts of its depositors to be then overdrawn in the aggregate of $23,413.38, the entry in the report to the comptroller as to the condition of overdrafts that day was $20,465 less than shown by the books, and the entry in such report was the sum of $2,948.38. You will have noticed that this difference ($20,-465) is the exact amount which defendant testifies he entered from or took from the overdrawn accounts of the books of the bank, and put into the entry in the report as to loans and discounts, and the matter may thus be stated. If defendant rightly did this,—that is, if in so doing he made a report to the comptroller of the true condition of the bank,—he did not then make a false entry in these particulars; but if the entry in reporting the overdraft that day as $2,948.38 instead of $23,413.38 was not a truthful entry, then it would naturally

follow that the entry in the loans and discounts of said $20,465 of overdrafts was also not a truthful entry, for this sum of $20,465 of overdrafts could not have been truthfully entered in both overdrafts and loans and discounts. In which did a truthful entry of the condition of the bank require it to be entered?

Now, there is no difficulty in understanding what an overdraft is. There is no conflict in the testimony on this point. The books of the bank, as testified to by defendant and by all the witnesses, and as themselves in evidence before you, show that an overdraft occurs whenever a depositor overdraws the amount of his deposits. I deposit in a bank a thousand dollars, subject to be checked out. I commence to check it out; and, whenever the amount of my checks paid by the bank exceed the amount of the funds I have deposited, an overdraft occurs in my account, and such overdraft is the amount the bank has thus paid, over and beyond the amount I have deposited.

Where, then, in the report to the comptroller should these overdrafts appear? You will find, upon looking at the report made to the comptroller, that it contains a heading called "Overdrafts." This heading is "Overdrafts,"—plainly and simply, and without more,"Overdrafts." This is the form the comptroller has prescribed, and which it was the duty of the defendant to follow, and to enter correctly and truthfully, whenever he made an entry in said report with regard to the condition of the bank as to overdrafts. Counsel for defendant have argued to you that an overdraft is in fact a loan, and that therefore the defendant was justified in including overdrafts in loans and discounts. But the comptroller demanded that the bank should report overdrafts in one place in the report, as well as loans in another place. Defendant assumed to report overdrafts. Did he make a true entry thereof? No explanation on the report advises the comptroller that the entry as to overdrafts is an impartial or incomplete entry as to overdrafts actually existing at the time the report assumed to give them. There is no separate heading of "Overdrafts Arranged for" in the report.

Let us for a moment recur to a point I have heretofore discussed. What is the object of these reports to the comptroller? Unquestionably to advise him as to the condition and method of management of the bank. Why are these reports required to be published in the public prints in the community where the bank does business? Without doubt, to afford information to the depositors, other banks, and public generally of the condition of the bank, and the methods pursued in its management. Hence the purpose and manifest wisdom of congress in requiring a true report of the condition of the bank. Else a bank tottering on the edge of insolvency, or already insolvent, and actually in a wrecked condition, and unreliable and unsafe in its method of management, would, by a law which had in view the safety of the community, be by that law afforded most ready means of deceiving the community, whose suspicions, if aroused, would by these false reports be lulled into repose, and the bank thereby enabled the more completely to pursue any scheme of bank wrecking or robbery upon which it had entered. Now, what

would be the difference, or would there be any, in the comptroller's office, as between a slight aggregate of overdrafts, say $2,948, in a report received, and one showing eight times as large, say $23,413.38, in his opinion of the soundness of the bank and its management? Or take an illustration from the evidence before you involving the same principle, but which, because of the large disparity between report and bank records in this respect, may present more clearly the point under consideration: The testimony given by defendant shows that on April 24, 1884, he reported to the comptroller the aggregate overdrafts of the bank as being $5,104.69; while defendant states the overdrafts on that day, as shown by the records of the bank, aggregated $149,724.05; making a difference between the overdrafts as reported to the comptroller, and as shown on the books of the bank, of $144,619.36.

In other words, on that day this bank, with a capital of $100,000, had overdrafts it was carrying for its depositors of well nigh 50 per cent. in excess of its capital. Can you doubt, gentlemen, that the judgment of the comptroller would have been different as to this bank's condition and as to its management had he found the sworn report from this bank showing within a few dollars of $150,000 overdrafts, from what it was when he found overdrafts reported as a trifle over $5,000? Had this immense aggregate of overdrafts been made known to the comptroller, how long think you he would have permitted this bank to have continued business? In the community where these reports were published, have you any doubt, gentlemen. as to whether those dealing with this bank, intrusting their funds to its keeping and management, would have felt differently had they known that, instead of the $5,000 published in its report, the books of the bank actually contained overdrafts of about $150,000, or nearly 30 times greater than the amount published as true, and exceeding its capital stock by $50,000? How long do you think the country banks having deposits in this bank would have permitted these deposits to remain had they known its overdrafts aggregated $150,000? But, as bearing on this matter, consider the further statement of the defendant that this $145,000 (carried on its books, but not reported, as overdrafts) was, in the report forwarded to the comptroller and published in the papers of this city, carried into and reported as a part of its loans and discounts, thereby swelling the aggregate of loans and discounts over $145,000. And now put these two matters together. If this community had known that the loans and discounts statement, as published, included and was swelled by an addition thereto of $145,000 of overdrafts, and that the overdraft account as published was $145,000 less than the overdrafts as shown by and actually being carried on the books of the bank, have you any doubt that the depositors and public generally would have viewed the bank, believed its condition, and regarded its management in a very different light from the opinions on this point held and experienced when they read the report as actually made? This illustration, apparently an extreme one, but one proved without contradiction by the testimony of the defendant to have actually occurred, and one

which but for this testimony of defendant I would not have dared to imagine had ever existed,—this illustration enforces the wisdom of the requirement of congress that the entries in these reports must be truthful and correct entries.

Counsel for defendant have argued before you that it makes no difference if overdrafts are entered in loans and discounts, for they are on the same side of the report, and are resources. But the very object of the comptroller in dividing up the resources is that he may thereby gain a knowledge as to what sort of resources the bank has; and to put overdrafts as loans and discounts, or as cash, because loans and discounts and cash are on the same side, to wit, are resources, is to report to the comptroller a state or condition of the bank not justified by this reason, according to the books of the bank.

Another matter bearing on the point under discussion demands your consideration. A letter has been introduced in evidence from the comptroller's office dated July 1, 1887, and which has been read before you. In this letter, under date of July 1, 1887, the comptroller notifies defendant and the other directors of the bank, among other matters complained of by him, that "the overdrafts are in large amounts, and some of them having been running for a long time." Now, the report of the bank as to its condition upon May 13, 1887, in its entry as to overdrafts, shows to the comptroller overdrafts existing to the amount of $7,810.23. Can you believe that this is the "large amount of overdrafts" to which the comptroller refers? Or does he refer to the actual amount of overdrafts as found on the books by Examiner Stone, and by him in June reported to the comptroller? The evidence of the defendant and the books of the bank show that on the date of that report the bank overdrafts were actually $18,009.45. Is it not probable it is this amount, almost one fifth the capital stock of the bank, to which the comptroller refers as large amount of overdrafts? The report of the condition of the bank at the close of its business on August 1, 1887, was a month or so after this letter of the comptroller had been received by the directors of the bank. Did that letter of the comptroller influence the method of defendant in making up his report of August 1, 1887? In his letter the comptroller had pointedly said: "I fear you do not realize the responsibility resting upon the directors in the management of a national bank. Should the time come for the enforcement of the law under section 5239, Rev. St. U. S., it will be enforced to the fullest extent."

What do the books of the bank and the testimony of defendant show were the actual overdrafts borne on such books August 1, 1887? The aggregate overdrafts are $23,413.58, an amount $15,603.62 greater than the overdrafts reported in the last bank report introduced, which preceded this letter of the comptroller, and $5,404.13 larger than was actually carried on the books of the bank at the date when the report of May 13th was made Now, the comptroller, under threat of the penalty of enforcing the law to the fullest extent, among other matters called the attention of the defendant and the other directors to the large amount of overdrafts and the long

time some of them had been standing. Had the report of August 1, 1887, reported to the comptroller the overdrafts actually standing on that day on the books of the bank, the report would have shown an actual increase, directly in the face of the comptroller's letter, of over $5,000 in the overdrafts carried by the bank. How were these overdrafts reported to the comptroller? The entry was that the overdrafts on that day carried by the bank were $2,948.08. The May report has stated $7,810.23 as the overdrafts then being carried. The comptroller's letter was then received. Another report is demanded; and while the books show an increase meanwhile in the actual overdrafts carried by the bank of $5,404.13, the report of August 1st, when compared with the report of May, (preceding the letter,) reports, as having occurred, a decrease in overdrafts of the bank of $4,862.15,—an actual increase of $5,404.13; a reported decrease of $4,862.15.

Coming back to the question I was considering, as to the undisputed fact that over $20,000 of that which on the books of the bank was on August 1, 1887, carried as overdrafts were not entered as overdrafts by defendant in his said report to the comptroller August 1, 1887, but were by him entered into said report as loans and discounts, it is for you to say, under all the evidence, whether, when defendant made the entries in these matters in said report, he made a "false entry," within the meaning of that term as I have defined it.

Testimony was offered by defendant as affecting this manner of dealing with overdrafts, in which offer it was attempted to show that other banks had been doing and were at the time pursuing in their reports to the comptroller the same methods claimed to have been pursued by this bank; but the court refused to permit the introduction of the evidence thus offered for this purpose. The court could not permit the practice of any other bank official in this regard to be considered by the jury as justification to defendant in his action. Two wrongs never make a right. Defendant must be judged by you on this point by the application of the law to the facts proven in this case. You will not, therefore, consider, as making right any wrong entry made by him, any testimony with reference to what any other bank did or may have done in this matter. But the court permitted defendant to show his knowledge as to what other banks had thus done, for the purpose of possibly bearing on the question whether, by what defendant entered as to overdrafts, the defendant intended to defraud or deceive any of the parties named in the indictment; and any knowledge defendant had on this point, as to the said practice of any other bank, may thus be considered by you when you come to consider the question of defendant's intent in this matter, and no further.

Defendant testified that in obtaining the aggregate reported as loans and discounts in his reports as on August 1, 1887, and October 5, 1887, he deducted, from what would otherwise have been reported as loans and discounts, the sum of $45,000, which he calls a "Contingent Fund." In so doing did he make his report truthful, or did he make the loans and discounts entry incorrect or untrue? From what source did this $45,000 come? What caused it to be

raised? How was it raised, and what did the bank do with it? In the order in evidence from the comptroller's office dated July 1, 1887, the bank was notified that its capital was impaired $45,000, and that the stockholders must raise and pay that amount, or the comptroller would proceed to put the bank in liquidation,—that is, would put the bank in charge of an officer to be appointed by him, close its doors, and wind up its affairs. This order was peremptory, the terms were imperative, and it demanded of the bank officials and directors an acknowledgment of its receipt, etc. Do any of you doubt that the comptroller meant what he said? Is there any question in your mind that the directors felt and knew the comptroller was in earnest in the matter? Read the letter which defendant says he wrote, and which he, with the other directors, signed and forwarded to the comptroller, and all possible doubt on this point is removed. In that letter defendant and the other directors stated that the sum of $45,000 as demanded had been "contributed and paid in to the cashier" of the bank, and reference is made in the letter to "the good work so well begun." How was this $45,000 paid in to the cashier, as the letter informs him? A part was paid in cash, and was placed among the other cash in the bank's vaults. For the remainder, notes were given, and the discount register or record shows a regular discount by the bank of these notes, the larger part of which are shown to have presently been paid in cash. Now, can there be any doubt in the mind of any sane man that if the statement in the letter was true, and not willfully false and intentionally deceitful, as an actual fact the $45,000 demanded had been actually paid in to the cashier? And, if paid in to the cashier, does not the discount record of the bank tell a truthful tale when it shows the note part of that $45,000 was discounted by the bank just as it would have discounted any other notes? This makes the letter true, and the discount record true. A part was paid in cash. Notes were discounted for the remainder, and the cash proceeds went into the treasury of the bank, and, as stated in the letter, the $45,000 was paid to the cashier. The good work had indeed been well begun, and thereupon these discounted notes became and were the property of the bank, just as truly and fully as any other notes discounted by the bank were the bank's property, or the statements of the letter were untrue and radically false.

All this occurred before the August report was made, and there appears no dispute in the evidence concerning it; and it is shown that at the time of this August report some $30,000 of this $45,000 yet remained upon the books of the bank as paper discounted by the bank. Can there be any serious question that it should have been reported to the comptroller, and included in the loans and discounts reported, and that, when this $30,000 (of the $45,000) was subtracted from what would otherwise have been the aggregate loans and discounts, the report was thereby made untrue and incorrect?

But, again, the evidence without contradiction showed that at the time of this August report $15,000 of this $45,000 had been paid in cash by the directors, and no loan and discount paper for it was held by the bank. Why, then, was this $15,000, in addition to the $30,000,

deducted from the loans and discounts? What possible justification can be urged for deducting this cash item of $15,000 from loans and discounts for the purpose of showing the true loans and discounts? Is there a doubt in the mind of any juror that according to the testimony of defendant, corroborated by that of Cashier Harris and by the entries in the books of the bank of that period, this deduction of $15,000 was incorrectly made, and the aggregate of loans and discounts thereby obtained was incorrect and untrue?

Defendant claims, and has offered some testimony on that theory, that this money and notes (this $45,000) did not belong to the bank either in August or October, 1887, and in fact they did not belong to the bank until depreciated or objectionable paper to that extent had been charged off by the board of directors, and that this was not done until after October, 1887. But the order of the comptroller demanding that $45,000 be raised neither contained nor referred to any such condition. That amount was to be unconditionally raised, and unconditionally paid into the bank. The penalty for not so doing was the closing of the bank. The letter, in the handwriting of the defendant, and signed by him and his associate directors, and sent to the comptroller, informed the comptroller that the $45,000 had been paid into the bank. The letter neither stated nor made reference to any condition such as now claimed by defendant. Was the letter thus written with intent to deceive the comptroller? There is no ground shown for such a presumption, but rather that the letter was written to inform the comptroller what it states to him, and was signed by defendant at the time when he meant and intended the statement he then signed; and he cannot successfully now urge a condition inconsistent with his letter, and which, if stated in that letter, it is but reasonable to believe would have resulted in what the comptroller threatened,—the closing of the bank doors. But the question still remains with reference to this point for the jury to determine, did defendant in what he did with reference to the deducting of this $45,000 from loans and discounts, and entering in the report to the comptroller as correct and true the amount of loans and discounts as thus obtained,—did defendant make a false entry, within the meaning of this term as I have defined it?

I come now to the charge that in the report of August 1, 1887, defendant made a false entry with reference to the liabilities of the directors. The government contends that this entry is too small by many thousands of dollars. The provisions of law wisely authorized the requirement that the bank shall report the liability of its directors to it. A bank rarely fails (and with reasonable certainty as to the answer I may appeal to your knowledge, and as a matter of common observation among men, that a bank is scarcely ever, if ever, wrecked) by loans to parties not members of its board of management. Hence the wisdom of the requirement that the report state the liability of directors. The bank directors must each be the owners of ten shares of stock, and there must be at least five directors. Frequently, if not ordinarily, some of the directors are larger stockholders; so that the law and the public can generally rely upon the interested directors seeing that the bank is not wrecked by appropriation, by parties out-

side the board, of any large amount of the funds of the bank, although the law limits even these loans. But the danger arises when the parties in the board either conspire together or connive at some of their members taking large amounts of the funds of the bank for their use in speculation or investment, or the like; and so in each report there is required to be entered the liabilities of directors. In this report it is stated as "Liabilities of Directors (Individual and Firm) as Payers."

The testimony of defendant is that on August 1, 1887, the bank was the owner of over $18,000 of paper drawn by L. D. Randall & Co.; that L. D. Randall was at that date a director in this bank, and, when this paper was discounted, was a member of the firm of L. D. Randall & Co.; but that.in this report to the comptroller he did not enter as a liability of director this said amount of L. D. Randall & Co. paper, because, as he thought, L. D. Randall was not liable as payer. If he so thought at that time, he erred in judgment. You are instructed that in this respect the entry as to liabilities of directors is, according to defendant's evidence, not correct and true, and that defendant should have entered that amount under the heading of "Liabilities of Directors." As to whether it is, as made by defendant, a "false entry," within the meaning of the term as I have defined it, you must decide under all the facts proven. Here, also, you may pertinently consider what, if any, influence upon the method which defendant practiced as to the Randall & Co. paper in report of August 1, 1887, the letter of the comptroller had.

In the last report in evidence preceding this letter from the comptroller there had been reported, as liabilities of directors as payers, the aggregate of $53,867.08. This was of date of May 13, 1887. The comptroller's letter, as I have stated, is July 1, 1887. In this letter the comptroller calls attention, by special reference, to the fact that certain loans he names exceeded the limit prescribed by law, and among them the comptroller named the loans to L. D. Randall of $19,049. (At this time L. D. Randall was a director in the bank.) The comptroller notifies defendant and the other directors of the bank as follows: "Attention is again called to the unlawful use of the bank's funds by its officers and directors;" and he adds: "I must ask that these loans be reduced immediately to within the limit," etc. Within about a month after the receipt of this letter another report was demanded by the comptroller. At the time of this last called for report of August 1, 1887, the bank was the holder of paper drawn by L. D. Randall & Co. for the amount of $18,000, and of L. D. Randall of about $5,000, in all exceeding the sum of $23,000, as paper on which said L. D. Randall, then a director, was liable as payer. The testimony of the defendant is to the effect that he did not enter this paper on which L. D. Randall was liable as a payer in the liabilities of directors as the same is entered in the report of August 1, 1887, and as of October 5,1887. In this respect the entry as to liabilities of directors is in each of said reports incorrect and untrue; and it is for the jury to say, from all the facts and circumstances proven, whether defendant made, with reference thereto, in said reports, a "false entry," within the meaning of said term as I have defined it to them in the preceding instructions. The defendant was permitted to state the reason why, as

he stated, he did not enter the said L. D. Randall & Co. paper among liabilities of directors, etc. The court permitted this reason to be given, that the jury might consider it as bearing on the question of intent; whether defendant had in his action any intent to deceive or defraud the persons named in the indictment, if you find that he made a false entry in this particular.

As to one other piece of paper, purporting to be a draft made by the Iowa City Gaslight Company by J. K. Graves, president, in favor of J. K. Graves, and held by the bank for about $5,700, defendant testifies that he did not enter this paper among liabilities of directors. Evidence has been admitted, namely, the sworn testimony of the defendant, tending to show that at the time this draft was drawn, or the orignal draft of the same import, of which this was one of the renewals, defendant knew that this paper, drawn by said J. K. Graves, who was then a director of the bank and a brother of defendant, and nominally drawn by him as president of the gas company, was in fact the paper of J. K. Graves, and so known to the defendant. The government contends that this draft was but a ruse or device whereby the said J. K. Graves was to be permitted to further increase his paper in the bank, under attempted color of a draft by said gas company. If the jury find from the facts proven that, at the time this paper was drawn and taken by the bank, said J. K. Graves had no authority to sign said paper with the name of said gas company as by him as its said president, and that the paper was in fact said J. K. Graves' paper and discounted for J. K. Graves' personal benefit, and that all these facts were at the time fully known to said defendant, and, so knowing, said defendant intentionally did not enter the same among liabilities of directors, the jury will determine from all the facts proven whether said defendant made a false entry in said report of liabilities of directors with reference to this matter, within the meaning of the term "false entry" as heretofore defined to them.

I have considered in some detail the items entering into the report of August 1, 1887. Many of the same items, and much of the same method of making the report, enter into the report of October 5, 1887. I shall not attempt to consider the several items of the October report. The jury may take the method of treatment I have given as to the August report, and themselves apply the same substantial method so far as properly applicable to the October report; and when they have considered all the evidence relating to the charges of false entries in said October report, and applying thereto the law as I have herein given it, the jury will determine whether the defendant made any "false entry" (as I have heretofore defined it) in said October report, with regard to loans and discounts or overdrafts or liabilities of directors, as stated in the several counts relating thereto.

If the jury do not find, in any one of the two reports above described, that defendant made any false entry charged in the indictment as the same is submitted to you, and as the term "false entry" has been hereinbefore described and defined, you will proceed no further in your investigations; for the making of such false entry therein is, as heretofore stated, essential to the finding of defendant's guilt. If

he made no false entry, he is not guilty of the crime charged, and must be acquitted. But if you should find, within the instructions above given you, that defendant did make any such "false entry" as to the particulars above stated, and within the meaning of the term as I have defined it to you, then you will proceed to consider the second and remaining point, which the government must prove to entitle it to a verdict of guilty, viz.: Did defendant make such false entry or entries, or any of them, with intent to deceive any agent appointed to examine the bank's condition, or to deceive some one or more officers of said bank, or to defraud said bank, or any other corporation or firm or person? And if the jury find such intent, in any manner as charged, is proven against defendant, this finding, in connection with finding defendant made the false entry as above defined, will authorize a verdict of guilty against defendant; but, if the jury do not find proven against defendant any such intent, the defendant must be acquitted.

It is a sound and wise principle of law that a man shall be held to intend the legitimate consequences of his acts; that is, that he intended that which is the natural and necessary result of his act, freely and knowingly done. If a man, knowing a coin is counterfeit, passes that coin upon another as genuine, he will not be allowed to say that he passed it with innocent intent. From his act of intentionally passing the coin as genuine, when he knows it to be counterfeit, the law presumes and holds him to the presumption that he passed it with guilty intent. If a man brings to me a horse, and proposes to sell it to me, and affirms to me that he owns the horse, and that his ownership is full and complete, when in fact he knows the horse belongs to another, and that he has not the least right or interest as owner in said horse, and I, relying on his statement, purchase the horse of him, he will not be heard to claim that he sold the horse to me with innocent intent, but the law stamps his act as done with guilty intent, as done with an intent to deceive me, and with fraudulent and false pretenses. In other words, wrongful acts knowingly and intentionally committed can neither be justified nor excused on the ground of innocent intent. The color of the act determines the complexion of the intent.

If a director of a national bank, in a report to the comptroller of the condition of his bank, makes an entry which is false, which does not contain or state the truth with regard to the condition of the bank upon the date named in this report, and such entry relates to a material matter, and such director, at the time he made such false entry, knew it was false and calculated to deceive, and that it did not give a true and correct statement of said bank's condition at the time with respect to such entry, in such case the law will not permit him to say that he made such false entry with innocent intent, and not expecting to deceive any one thereby. If such a director willfully puts up a report designed to allay any suspicion then existing, designed to induce faith and trust in his institution, and it is proven that the entries in that report are false in fact, and at the time he made them he knew them to be false, it would be a mockery upon justice to allow him to say that he made those entries with innocent intent. In such

a case, gentlemen, the act done is in law stamped with guilty intent on the part of the person doing it.

Notice, gentlemen, that in all the instances I have named I have given prominence to the fact of knowledge in the person doing the act. I do not mean that a man can be convicted of the crime charged in this indictment for merely negligent, careless action. Speaking generally I may say that, if the director making the false entry was in fact ignorant of the condition of the bank, and did not know its resources and liabilities, however recreant he might be to the position he held and the duties devolving upon him, and whatever other liabilities, civil or criminal, he might thereby be subject to, he could not be convicted under the section on which this indictment is based; and yet I ought to add that this does not in any wise justify or authorize a director to purposely, willfully, and knowingly close his eyes and his ears to the facts around him, or which lie directly in his path, for the purpose of making it easier to those engaged in plundering or wrecking a bank. Let me illustrate my meaning: If a director of a national bank, knowing that those in charge of or actively managing the bank are despoiling it, robbing its treasury, knowing that the funds of the bank are being dissipated, improperly withdrawn from the bank, and worthless paper (miscalled "securities") is being substituted instead thereof,—if, thus knowing, such director refuses to accept the information lying directly across his path, and purposely keeps himself in ignorance or refrains from taking active part in the bank's management, that he may thereby permit such transactions to go undisturbed or undetected, and he then lends the credit of his name, puts his signature to untrue and false reports connected with the condition of the bank for the purpose of enabling such a fraud to go undetected,—in such a case it will be no shield to him to show that he had no knowledge of the truth or falsity of the report he has signed. To hold otherwise would be to make the law go hand in hand with rankest injustice, to legalize robbery, to make our temples of justice modern cities of refuge, and our courts encouragers of what plain people properly call crime.

Therefore I have to say to you, gentlemen, as the law of the case upon this point, that if the defendant, at the date named in the reports to the comptroller named in the indictment, as submitted to you, knowingly inserted in a report of the resources and liabilities of his bank a false entry as heretofore defined to you, and as charged in the indictment submitted to you, of such a nature that the ordinary, natural, and legitimate result thereof would be to deceive the other officers of the bank, or any one of them, or any agent then or thereafter appointed to examine affairs of said bank, or to defraud the bank or any other company, body politic, or corporation, or any individual person whatever, then, in the absence of contravening proof, you are authorized and justified to find that defendant made such false entry with the intent to deceive or to defraud, within the meaning of the statute, and to find against the defendant as to the second and remaining point as above stated.

You may have noticed, as I stated to you the section under which defendant has been brought to trial, that the statute does not require

that any person should have been in fact defrauded or actually deceived by the false entry in order to make the crime complete; and so it is not necessary, in order to complete the proof of a violation of this section, that it shall be shown to you that any officer of the bank, or any agent appointed to examine into the condition of the bank, has in fact been deceived by a false entry in the report, nor that in fact any company, corporation, or individual person has been defrauded by the false entry. The attempt to deceive or to defraud may not have been adroitly planned or skillfully performed,—it may have been so bunglingly carried into execution as that every officer of the bank and the bank examiner could, upon referring to the bank records, readily detect the entry to be a false entry; yet if there was any attempt to deceive, if the false entry was knowingly entered, and was a false entry which was naturally and necessarily calculated to mislead, this would be sufficient, in the absence of contravening proof, to authorize the finding that the person making it made such false entry with intent to deceive. The law might have made it otherwise, but it has not. The law wisely was framed to meet the criminal on the very threshold of his crime, and before he had consummated such crime. The policy of the law was by congress wisely established, so that one reading the report should have the right to rely thereon as being a true report; and a depositor or bank dealing with the bank making the report is not required to investigate the books of the reporting bank to see if the report is honest and true. The bank official, at his peril, must make it truthful according to his knowledge when he signs his name to the report as being correct; and, if he intentionally made it otherwise, he must answer to the law in any attempted or intended deceit he has practiced. And therefore if the evidence shall prove to you that any "false entry," as I have defined it, submitted to you for your consideration, has been knowingly made by the defendant with the intent to defraud or to deceive any of the parties named in the indictment, that is sufficient to constitute the crime charged against the defendant, even though none of said named parties have actually and in fact been deceived or defrauded thereby. The gist of the crime is in making the false entry with intent to deceive or defraud any of said parties.

Your verdict, gentlemen, must be found upon the evidence introduced before you, and be considered by you under the law as given by the court. As I have heretofore said to you, this trial commences before you with the presumption of innocence in favor of defendant, and your verdict must be for defendant, unless you find the evidence overthrows this presumption, and brings your minds beyond a reasonable doubt to a verdict of guilty.

I have to say to you further, gentlemen, and this statement is to be understood as affecting the entire charge given you, that, if you can reconcile the evidence before you upon any reasonable hypothesis of the defendant's innocence, it is your duty to do so. And, before you can find the defendant guilty of the crime charged in the indictment, you must find such guilt beyond a reasonable doubt. This reasonable doubt relates to the defendant's guilt under all the evidence. You will take up the evidence bearing on each proposition of fact, and de-

termine whether that fact has been proven; and you must find the defendant's guilt has been proven beyond a reasonable doubt before you are authorized to return a verdict of guilty. And after considering all the evidence, if you have a reasonable doubt of the guilt of the defendant, you must acquit him; but if, upon such consideration, you do not have a reasonable doubt of his guilt, it is your duty to return a verdict of guilty. A "reasonable doubt," as I have used the term, is what the term indicates. It is a doubt based on reason, and which is reasonable in view of all the evidence. It is an honest, substantial misgiving, generated by insufficiency of proof. It is not a captious doubt, nor a doubt suggested by ingenuity of counsel or jury, and not warranted by the testimony; nor is it a doubt born of a merciful inclination to permit the defendant to escape conviction, nor prompted by sympathy for him or those connected with him. But if, on impartial comparison and consideration of all the evidence, you can candidly say that you are not satisfied of the defendant's guilt, you have a reasonable doubt. If, however, on an impartial comparison and consideration of all the evidence, you have an abiding conviction of the guilt of defendant,—such a conviction as you would be willing to act upon in the more weighty and important matters relating to your own affairs,—then you have no reasonable doubt.

The defendant has testified in his own behalf. This he had a right to do under the laws of the United States. And he has the same right to place himself on the witness stand that the law gives him to have any other person sworn as a witness in his behalf. But it is the duty of the court to state that the law sends his testimony to you charged with whatever may properly attach to or affect that testimony because of his interest in the result of the case. It has been but a few years, comparatively, since a defendant charged with crime was by law denied the privilege of testifying for himself. The theory of the law which refused to accept a man as a witness in his own defense, when arraigned in court and on trial upon a criminal charge, was that the interest of the defendant in the case was necessarily so great, and so great the temptation to testify falsely in order to acquit himself, that the law refused to permit testimony so liable to be tainted with perjury to be placed before the jury; and therefore the mouth of defendant was closed by operation of law. But, as I heartily believe, a wiser policy or theory of law now prevails, and I had the pleasure of casting my vote in favor of a statute which, in the state courts of Iowa, has opened to a defendant in a criminal trial the full privileges of the witness stand; and the statutes of the United States award him the same privileges. The government, however, cannot compel him to testify on his own trial. Possibly in some cases the evidence necessary to complete proof of guilt is alone in defendant's possession, yet the district attorney, with all the power of this great nation behind him to compel witnesses to testify to the truth, is powerless to open the mouth of such defendant. The nation itself is not strong enough to force from a defendant, and against his will, even a single word of testimony, or to compel such unwilling defendant to submit to the jury a paper or line of writing. But he may, if he will, testify in his own interest; and, when he does so testify, the

law sends his testimony to you charged with this interest, and you are to examine and test it accordingly. The defendant may testify as truly, and his testimony be in fact entitled to as much weight at the hands of the jury, as that of any other witness. You are to determine that fact in the case, as you may consider it under all the circumstances of the case, and with reference to its consistency in itself, or as it may be corroborated by evidence deemed by you to be credible. A defendant's testimony may be so manifestly tinctured and tainted with his interest, and with a desire to thereby acquit himself, as that the jury will feel compelled to cast it aside, and wholly reject it. You are to determine in this case what, if any, weight the defendant's testimony shall have at your hands; and when you have considered it in the lines I have suggested, and compared it with the other evidence in the case, and the facts and circumstances you may find proven, give to the defendant's testimony such weight as you may find it is rightly entitled to receive at your hands.

You are the sole judges of the testimony. Under the oaths you have taken you are to receive, as the law applicable to this case, the instructions given you by the court, and you are to be governed by them; but it is your sole province to determine the weight to be given to the testimony which has been introduced. Consider the demeanor of the witnesses on the witness stand; their relation to the defendant in any way, business or otherwise; their interest or lack of interest in the case, or their connection with any case which might be in any wise affected or influenced by the verdict to be rendered in this case; any bias or prejudice shown by them; the consistency or inconsistency of their statements; whether their testimony is corroborated or contradicted by other testimony regarded by you as credible and worthy of belief; and, having considered the testimony in the light of all the circumstances in the case, give to the testimony of each witness that weight to which you find it is entitled. Wherever you can consistently reconcile conflicting testimony, it is your duty to do so; but, where you find any conflict of testimony you cannot reconcile, do not hesitate to cast aside that which you deem incorrect and untrue, and accept and hold fast to the truth as you find it established in the evidence.

Gentlemen, take this case, determined to do justice both to the government and to the defendant. The government is in no wise entitled to, nor does it ask, the conviction of any man who is not proven guilty of the crime with which he is charged, nor should your verdict declare the guilt of such a one; but if defendant is proven guilty, within the terms of the instructions I have given you, it is your duty to say so by your verdict. Thus innocence is protected by our courts, and guilt is brought to its just punishment.