THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ANDREW J. HORVATT (Not Tried), THOMAS J. MANGAN and Others, Appellants.*

Third Department, December 30, 1932.

* Affd., 262 N. Y. ——.

*Clayton R. Lusk* [*Frank J. Mangan* of counsel], for the appellant Thomas J. Mangan.

*Clayton R. Lusk*, for the appellant Elmer J. Churchill.

*Orange L. Van Horne* [*Herman Friedlander* and *Sol Lipschitz* of counsel], for the appellant Sigmund A. Friedlander.

*John J. Bennett, Jr., Attorney-General* [*John T. Cahill, Second Assistant Attorney-General*, and *Charles T. Keane, Jr.*, and *Joseph M. Mesnig, Assistant Attorneys-General*, of counsel], for the respondent.

HINMAN, J. The former indictment for the same offense was dismissed on motion and upon the consideration of the evidence before the grand jury. An order dismissing an indictment is no bar to a future prosecution for the same offense. (Code Crim. Proc. § 320.) If the former indictment had been demurred to and the demurrer allowed, that would have been a bar to another prosecution for the same offense without an order of resubmission and unless the court sustaining the demurrer directed a resubmission. (Code Crim. Proc. § 327; *People* v. *Zerillo*, 146 App. Div. 812.) No order was necessary here. (*People* v. *Rosenthal*, 197 N. Y. 394.)

The indictment upon which the defendants were convicted was what is known as a short-form or simplified indictment. The defendants moved for a bill of particulars, which was furnished. No motion was made for a further bill of particulars. The indictment was sufficient. (*People* v. *Bogdanoff*, 254 N. Y. 23.)

The pertinent language of section 304 of the Penal Law, under which the defendants were convicted, is as follows: "Any * * * director * * * of any corporation to which the Banking Law is applicable who makes a false entry in any * * * report or statement of such corporation with intent to deceive * * * any public officer * * * to which such corporation is required by law to report, or which has authority by law to examine into

its condition or into any of its affairs, * * * is guilty of a felony."

No act or omission is a crime in this State unless some statute so prescribes. (*People* v. *Knapp*, 206 N. Y. 380.) And a penal statute must be strictly construed. " While it is true that care must be taken not to weaken the wholesome provisions of the statutes designed to protect depositors and stockholders against the wrongdoing of bank officials, it is of equal importance that they should not be so construed as to make transactions of such officials, carried on with the utmost honesty and in a sincere belief that no wrong was being done, criminal offenses, and subject them to the severe punishments which may be imposed under those statutes. (*Potter* v. *United States*, 155 U. S. 438; *Spurr* v. *United States*, 174 id. 728.) A court cannot create a penalty by construction, but must avoid it by construction, unless it is brought within the letter and the necessary meaning of the act creating it." (1 Michie Banks & Banking [1931 ed.], § 206.)

For many years prior to the enactment of section 304 of the Penal Law, and ever since that time, it has been the law of this State that a director of a bank, who is negligent in the performance of his duties and whose negligence is shown to have causal connection between the wrong and the collapse of a bank, is guilty of a misdemeanor. (Penal Law, § 297; *People* v. *Mancuso*, 255 N. Y. 463.) Section 297 of the Penal Law was on the statute books long before section 304 of the Penal Law was enacted in 1912,* making a director guilty of a felony if he makes a false entry in a report " with intent to deceive." It is reasonable to conclude that the Legislature intended to distinguish between the negligence of a director resulting in the insolvency of a bank, and his intentional act — his actual " intent to deceive." The former involves the failure to administer the affairs of a bank with reasonable care and diligence and expressly provides that insolvency resulting therefrom shall be deemed fraudulent, and a director is deemed, within the definition of that statute, to participate in the fraud if he participates in the negligence which causes the ruin. (*People* v. *Mancuso*, *supra*.) Yet that offense is made only a misdemeanor. An offense more serious than negligence must have been contemplated in the felony provision later enacted, namely, a willful act committed with a purpose or design to deceive. " The difference between negligence and wilfullness is a difference in kind and not merely a difference in degree, and accordingly, negligence cannot be of such a degree as to become wilfullness, while, on the other hand,

---

* Added by Laws of 1912, chap. 208.— [REP.

a wilful act involves no negligence." (45 C. J. 672, 673.) Such would be the reasonable interpretation based upon the history and language of these two penal provisions. This is the first prosecution under section 304 of the Penal Law, so far as the research of court and counsel has revealed. Reasonable doubt as to its interpretation should be resolved in favor of the accused.

Our attention has been called, however, to section 592 of title 12 of the United States Code, being *prima facie* the same as section 5209 of the United States Revised Statutes (as amd. by 40 U. S. Stat. at Large, 972, chap. 177, § 7), which makes it a misdemeanor for a director of a Federal reserve bank to make a false entry in a report with intent to injure or defraud, or to deceive the Comptroller of the Currency or others specifically mentioned. The making of such a false report is by the Federal statute only a misdemeanor. That statute has been construed in a number of cases. In the paraphrase of the annotated editorial footnotes to said statute (12 U. S. Code Anno. pp. 430, 462) it has been said that the statute is penal and must be strictly construed ( *United States* v. *McClarty*, 191 Fed. 518); that " only a person guilty of knowingly making a false entry in a national bank's report to the Comptroller is guilty of violating this section, and not an officer of the bank who verifies the bank's report containing such entries, without knowledge or responsibility therefor " ( *United States* v. *Herrig*, 204 Fed. 124); that " a ' false entry ' in a report by a national bank officer or director, within the meaning of this section, is not an incorrect entry made through inadvertence or negligence, but is an entry known to the maker to be untrue " ( *United States* v. *Graves*, 53 Fed. 634); that " intent to injure, defraud or deceive is a material ingredient of the offense of making false entries " (*Agnew* v. *United States*, 165 U. S. 37); that " the jury could not have convicted if they had found that the entry had been omitted through any inadvertence or negligence, or in ignorance of its untrue character." (*Cochran and Sayre* v. *United States*, 157 U. S. 286, 298.) In the last cited case, in commenting upon the liability of one who verified a report, ignorant of the truth or falsity of the entries, the court said (at p. 294): " he could only be held criminally for an evil intent actually existing in his mind — at least unless his ignorance were wilful, or his negligence in failing to inform himself so gross as to characterize his conduct as fraudulent."

It is apparent that the learned trial justice believed that these defendants were legally convicted on the theory of gross negligence and upon his interpretation of the last quoted comment of the court in *Cochran and Sayre* v. *United States* (*supra*). At the time the court pronounced sentence, he so stated in substance. And he said:

"It was not larceny. It was not embezzlement. You didn't steal anything. Your crime consisted of neglecting your duties as directors, grossly neglecting them." We think that the phrase, "negligence in failing to inform himself so gross as to characterize his conduct as fraudulent," if applicable here, must be given a reasonable interpretation. The failure of a director to inform himself must have been so glaringly reprehensible as to indicate that he did know or was willfully ignorant and thus intended deceit, which presupposes knowledge. That would be especially true in this State where we have two penal provisions, one based on negligence and the other on willful acts committed with purpose and design to deceive. It would seem that the Legislature must have intended to make them mutually exclusive.

The report of examination of the State Bank of Binghamton, made on October 30, 1930, and submitted to the Superintendent of Banks by these three defendants, was made in pursuance to sections 130 and 131 of the Banking Law. They were required " to examine fully the books, papers and affairs of the bank " twice a year and were empowered " to employ such assistance in making such examination as they may deem necessary." (Banking Law, § 130.) They were required to make a report to the board of directors in writing as to such examination, sworn to by them, to be filed in the bank and a duplicate thereof to be filed in the office of the Superintendent of Banks. " Such report shall particularly contain a statement of the assets and liabilities of the bank examined, *as shown by the books*, together with such deductions from the assets, and the addition of such liabilities, direct, indirect, contingent or otherwise as such directors or committee, after such examination, may find necessary in order to determine the true condition of the bank." Liability of every officer or director to such bank must be shown; also a statement in detail of doubtful or worthless loans or overdrafts and " a full statement of such other matters as affect the solvency and soundness of the institution." (Banking Law, § 131.) They were also to inquire into " such other matters as the Superintendent of Banks may require." (Banking Law, § 130, as amd. by Laws of 1920, chap. 546.)

The report in question did not reflect the true condition of the bank, which had been systematically looted over the years by its president with the connivance and assistance of practically the entire working force, including the bookkeeper. The report did, however, reflect the condition of the bank accurately as revealed in the books of the bank, which balanced every night. The defendants were never active officials in the bank and there is no proof or contention that they profited in any manner or assisted in any

manner, or had any knowledge of the looting until December 15, 1930, when the bank was closed and taken over by the Banking Department. The question is whether these examining directors were shown to have been guilty beyond a reasonable doubt of making a false entry in the report with intent to deceive.

The State Bank of Binghamton opened for business in January, 1924, and succeeded a private bank which had been conducted by Andrew J. Horvatt, who became the president and owned nearly all of the stock of the State Bank, which was organized with a capital of $100,000 and a surplus of $25,000. A firm of expert accountants were called in to take charge of the liquidation of the private bank and reported to the Banking Department and also each year made an audit of the State Bank at the end of the year until 1929. Nothing wrong was found or reported to the directors. The Banking Department also supervised the liquidation of the private bank and the organization of the State Bank and each year, twice a year, sent its bank examiners to examine the latter but never found anything wrong with the bank or its bookkeeping.

The bank was located in what is known as the foreign section of the city of Binghamton and its patrons were made up largely of working people of foreign extraction who lived in the city of Binghamton, Endicott and Johnson City. Andrew J. Horvatt was prominent amongst this foreign element and greatly trusted by them. Although he had been in the liquor business in Binghamton before prohibition, and his father before him, he was a man of good habits, never smoked or drank, was attentive to his church duties, had been decorated by the Pope for his services to his people and was treasurer of the Greek Catholic Union, involving the control of large sums of money. The good will of the bank was largely built around him and he practically owned it and was its active manager. The defendant Mangan, a busy lawyer, and for many years a member of the New York State Board of Regents, had known Horvatt for many years, had employed him as interpreter and had been his attorney. When the State Bank was organized Mangan was asked by the Superintendent of Banks to become a director and he became a director and vice-president and secretary and the firm of Mangan & Mangan became attorneys for the bank. Mangan told the Superintendent of Banks that he could not be active in the bank because he was out of town probably half the time. The Superintendent said that he wanted Mangan for a director because he wanted the money that the bank made saved up for a surplus and he wanted somebody as a director who was in touch with the other banks of the city so that if trouble developed in the State Bank at any time assistance could be obtained from

the other banking institutions of the city. Mangan had then been for some time previously a director of another bank in Binghamton. The defendant Churchill, who was an elderly man and had been in business in Binghamton for twelve years, also became an original director of the State Bank and continued his private business until the spring of 1930, when he sold it to his son. The defendant Friedlander was a merchant and had been engaged in business in Binghamton for many years. Both he and Churchill had their places of business in the section where the State Bank was located and both had been directors of banks previous to becoming directors of the State Bank. Mangan knew few of the customers of the bank. Churchill and Friedlander had a more extended acquaintance among the patrons of the bank. These three directors had been on the examining committee of the board on other occasions previously to October 30, 1930, and nothing was found wrong with the bank, its records or bookkeeping; but such was also the case with the bank examiners of the Department and the firm of Powell & Co., expert accountants, who made the annual audit. They found the books were well kept and that the assets and liabilities checked with the books which always balanced. The same method of examination was used by the examining directors as was used by the others. It was established on the trial by Mottram, a witness for the prosecution, an assistant cashier who had been granted immunity, that even at the time of the organization of the State Bank there was a shortage and some forged paper. The manipulations had been so skillfully conducted by Horvatt and his conniving assistants that even that had escaped the attention of the expert accountants who took charge of the liquidation of the private bank and everybody else.

The conniving employees had been with the bank from the beginning and were men who bore excellent reputations. The directors were empowered by the statute to employ assistants. They were not expert accountants and trusted their employees as being honest. They checked with the daily balance sheets, which checked with the general ledger. Adding machine slips (called runnings) were prepared by the active staff of the accounts of the bank. These were used in the checking. Such runnings were used by the expert examiners. The examining directors were kept informed, or supposed they were, by the president as to loans at the regular meetings of the board and the president had power to make loans of less than $1,000. It is not unreasonable that they should presume somewhat on their supposed knowledge of the loan accounts. The witness Mottram showed the machinations of Horvatt and others of the staff to hide the facts, showing how some accounts were kept

entirely outside the regular bank and that Horvatt prepared a separate running of notes and that a crooked bookkeeper kept the books adjusted and balanced. It is impossible to tell what, if any, forged notes were ever exhibited to the directors. A crooked running, with selected notes and a forced total on the running of notes could agree with the total note records in the general ledger of the bank. The note liability ledger was a loose-leaf ledger in which the loan accounts were usually kept separately, were readily removable and the totals were kept only in the general ledger. The notes were kept loose in a box.

On October 30, 1930, the day of the examination in question, Friedlander and Churchill went to the bank early and counted the cash. Mangan went to the bank about nine o'clock. Runnings had been prepared of the accounts of the bank. Mangan, with the assistance of Horvatt, who held the notes and called them off, checked the notes with the running, which Mangan held. The bonds and mortgages were examined and the insurance policies covering them. The interest-bearing accounts, the Christmas club accounts and the commercial accounts were checked with the runnings. All these things checked with the daily balance sheet and the general ledger. Letters had been sent to their New York correspondents asking the amount of money standing to the credit of the State Bank and for a list of the bonds held by the New York banks for the State Bank. Their replies were checked over and found to correspond with the daily balance sheet and the general ledger. The report of the examination reported the book value of the securities. The securities had depreciated. Under the title of remarks the committee called attention to the fact that their bonds as in several institutions were somewhat off the amount for which they were purchased but they believed that in a different bond market the situation would be easily remedied. The reference in the report to the management of the bank being good referred of course to manner of conducting the bank. Similar comments had been made by the experts.

There is no question that the report contained false items and did not show the true condition of the bank. It did show the condition as revealed by the books but the books did not show the true condition. There were shortages in all accounts and a large amount of forged notes which were not disclosed by the report. Before the bank failed, Mottram, star witness for the People and assistant cashier of the bank, knew that the bank was being dishonestly conducted and other officers employed there knew it and they discussed it among themselves and tried to have the president,

Horvatt, tell Mangan and the directors. This he refused to do and they were never told until the crash what the situation was.

The case was tried and submitted to the jury upon the theory that the intent to deceive could be found from something less than actual knowledge on the part of the defendants; that there were certain warning signals pointing to possible dishonesty and improper management.

It was strongly urged by the People during the trial that Horvatt was a bootlegger, but there is no actual evidence that he was. It was urged that Mangan knew of bootlegging activities and, therefore, ought to have thought that one who would engage in such unlawful enterprise would run the bank unlawfully. Evidence was admitted which showed that Mangan had taken an acknowledgment for a bill of sale of some bar fixtures to Horvatt, back in 1920, which had been in his hotel before prohibition but which had belonged to the Standard Brewing Company. Evidence was offered of a raid known to Mangan that was made upon a place conducted by a man who was in no way connected with the bank but whose place was property adjacent to the bank which had belonged to Horvatt and which a witness said he had heard referred to as Horvatt's place. There is no evidence connecting Horvatt with the running of that place and there is evidence that he had sold the property upon a land contract. There is other evidence that Horvatt owned considerable real estate around there which was familiarly called Horvatt's property. Mottram testified that at one time liquid leaked down from upstairs over the bank and that there was a strong smell of alcohol in the bank. He was the only witness who gave such testimony and there is no proof that the fact was brought home to the defendants. Evidence was also offered of telegrams between Horvatt individually, who was also engaged in the drug store business, and some party in Pittsburg, Penn., in 1925, relative to the sale of bonded warehouse receipts for liquor, a perfectly legal procedure and not shown to have been a bank transaction. The first that any of the defendants knew about any of these telegrams was when they were produced upon the trial. The defendants all testified that they did not know that Horvatt was in any way engaged in illicit liquor business. They knew that he had been in the liquor business before prohibition had come in and they knew he had discontinued his hotel and remodeled it to start his private bank. And there is no direct evidence that he had continued the business. There was no proof to substantiate the opening statements by counsel for the People that a large part of the funds of the bank had gone into the bootlegging business. That statement made in the opening without any evidence offered to substantiate it was very prejudicial to these

defendants. Whatever there was as to the Orange Driving Club was not evidence brought home in any way to these defendants and tended only to create a prejudice in the minds of the jurors against the defendants.

It was also testified that a man in Binghamton conducting a brokerage office informed Mangan, four or five years before the bank failed, that Horvatt was speculating. It appeared that Mangan immediately investigated this and brought the accuser and accused together and satisfied himself that Horvatt was not speculating. The brokerage accounts of Horvatt had only run a short time and had all been closed out at the time the information was given and there is no proof of any subsequent speculations. The evidence in question was given to Mangan by the broker because he believed that Horvatt was going to back one of the broker's former employees who was starting in opposition to him. No proof of speculations was ever at any time brought home to the other defendants.

A careful examination of the evidence relied upon by the People to have put the defendants upon notice fails to disclose anything of weight. There was no information that would have aroused the suspicion of any fair-minded man in the absence of finding something irregular in the bank. In weighing this information, consideration must be given to the character of the bank and the customers that it had. They were mostly people of foreign extraction and probably would not have given their business to a bank the president of which did not understand their habits and ways as well as Horvatt did. That he had been successful in dealing with them was known to the defendants.

It has not been shown that there was any motive for intent on the part of the defendants to deceive or to fail to inform themselves. They served without pay, never received any dividends upon their stock as their policy was to build up surplus. The loans to them were amply secured. None of them knew of the looting and never made a dollar out of it. In fact the entire picture taken from the evidence about these three defendants goes to show that none of them could have had any motive to deceive.

There is no direct proof that the defendants had knowledge of the falsity of the report made by them as to the condition of the bank; on the contrary, the testimony on the part of the People is that the condition was concealed from the defendants. The evidence is insufficient to support an inference that the defendants had knowledge of such falsity. It falls far short of the requirements of evidence sufficient to show that the defendants were guilty of intent to deceive or that they were guilty of such failure to inform themselves as to permit the inference that they did know or were willfully

ignorant and thus intended to deceive. Even in a civil case it has been repeatedly held that where evidence relied upon to establish a fraudulent intent does not necessarily lead to that conclusion, but is equally as consistent with innocence as with wrongdoing, that construction must be given to it which will exonerate the party from the intent charged. (*Constant* v. *University of Rochester*, 133 N. Y. 640.) If this is the rule in civil cases where a fact may be established by a mere preponderance of evidence, certainly there is greater necessity for its application in a criminal case which requires guilt to be established beyond a reasonable doubt. It is manifest that wrongful intent on the part of any of these defendants has not been established beyond a reasonable doubt.

The case was tried with marked ability, but as is likely to happen in such cases of first impression and importance, it is claimed that there were errors so prejudicial as to require a new trial. These would have to be dealt with if it were not for the fact that we have concluded that there was not sufficient evidence to warrant the submission of the case to the jury. The People failed to establish beyond a reasonable doubt the crime charged against the defendants in the indictment and the motion made by the defendants to dismiss the indictment and to discharge the defendants ought to have been granted.

The judgment of conviction should be reversed as to the defendants Mangan, Churchill and Friedlander and the indictment as to them dismissed.

VAN KIRK, P. J., HILL, RHODES and CRAPSER, JJ., concur.

Judgment of conviction as to defendants Mangan, Churchill and Friedlander reversed, and indictment as to them is dismissed.