In the Matter of EDWARD S. COWLES, Petitioner, against BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK, Respondent.

Third Department, November 10, 1943.

*Lloyd Paul Stryker* and *Harold Shapero* for petitioner.

*Nathaniel L. Goldstein, Attorney-General (Orrin G. Judd, Solicitor-General; Henry S. Manley, Assistant Attorney-General* of counsel), for respondent.

HILL, P. J. This is a review under article 78 of the Civil Practice Act of a determination made by the Board of Regents, which was transferred to this court by the Albany Special Term (FOSTER, J.). The Regents decided that petitioner was guilty of fraud and deceit in the practice of medicine through aiding the Body and Mind Foundation, a corporation, to practice medicine, and by aiding one Rudolph Rebold, not licensed to practice as a physician " to hold himself out as a licensed physician and to use the title ' M. D.' ". Rebold's alleged practice was in connection with the work of the Foundation. Petitioner's authority to practice medicine in this State was suspended for one year from the date of the service of the order and until he is reinstated by the Commissioner of Education. A corporation may not practice, and the Foundation has been convicted of so doing, and Rebold has been convicted of practicing without a license.

A recital of the origin of the Body and Mind Foundation is necessary to explain petitioner's relation thereto. Dr. Guthrie, Rector of St. Mark's-in-the-Bouwerie, discussed with Dr. Shipler (a Doctor of Divinity), editor in chief of the *Churchman,* the inaugurating of a faith healing clinic in St. Marks. The latter advised that such a movement should be under the direction of a medical man, and recommended petitioner, who had been identified with the Emmanuel Movement connected with a church of the same name in Boston while he was a student in the Harvard Medical School. Several of his professors were interested in the work, which was of the same general character as that proposed by Dr. Guthrie. Up until early in 1934, the activity was called the " Body and Soul Medical Clinic " with headquarters at the church. Then, on advice of a reputable member of the Bar, a membership corporation was formed, taking the name " Body and Mind Foundation, Inc.". Prior to the incorporation, no charge had

been made for membership. Thereafter the activity was moved, first to the Stuyvesant Casino at Sixty-ninth Street and later to another mid-town address, where a small membership fee was charged, but it is not disputed that any one without money was treated, and that half of the members made no payments. The attorney who gave the advice consulted with eminent counsel who were interested in the work, and he gave it as his opinion that a license as a dispensing clinic was unnecessary and that the work of the corporation did not amount to the practice of medicine. The criminal court agreed with the first but not as to the latter proposition. The friends of the petitioner, many of whom were interested in the work of the corporation, included most eminent physicians, attorneys, scientists, educators, publicists, and place-holders in the social register.

The treatment and procedure at the Foundation are described by nine paid investigators, five by written reports. This court is well acquainted with most of the group through other cases presented. Testimony was also given by the father of a one-time patient now in the Rockland State Hospital for the Insane where she was committed after having been treated at the mental pavilion of the Bellevue Hospital; and by a patient, Helen Tabin, who had been treated by a reputable physician, according to her statement "for a palpitation of the heart and general nervousness, not outward nervousness but something inside that he really didn't understand". This physician recommended the Foundation to Miss Tabin, who describes her conversation with Miss Dolin, a psychologist, who lectured and worked with the patients: "Well, she used to ask me how I was, and I at the time didn't want to dress very much, and she tried to get me to change my clothes, and I had scruples about wearing certain dresses certain days, and all that. And she tried to get me to change my mode of thinking. Then some other problems I asked her about and tried to get advice from her, and I always felt tired."

She had a discussion with Dr. Cowles which she describes: "On this one occasion before I had gotten ill, I had been going out with some fellow, and, well, I was magnetized by his personality, and I felt I wanted to break away from him because he wasn't the type of person I should have been out with. I didn't like his character or anything about him. I don't know whether it was due alone to the fact that I was really attracted to him some way or other; I found I couldn't break away from him very well. I told this to Dr. Cowles on this occasion. He

said ' Well, that's dementia precox.' " She began to cry and was soothed and calmed by Dr. Stern. On another occasion in a conversation with Dr. Cowles which the witness sought: " It wasn't easy to get in to see him, because he had so many people ", she told him that she didn't feel much improved. " He told me to go out and do things and I just couldn't, my body just wouldn't move around the way I wanted it to. I was very tired all the time ". And on another occasion when she told the petitioner in response to his inquiry that she was not feeling very well, Dr. Cowles with considerable vigor said: " If you do what I tell you to do, you will be all right " and the witness says: " I told him it was impossible for me to do what he told me to do, because he wanted me to be active, and I was afraid to travel alone, and I just couldn't travel alone, that's all."

She was called to the platform to address other patients at a time when she thought the treatments had helped her.

She describes her statement: "I told what was wrong with me, and I am not a nervous person, talking so people seemed to enjoy my lecture very much. * * * I told them how I had become ill, I worked very hard, and had gone to college at night, didn't eat properly, broke down, and developed a palpitation of the heart, and from that developed all kinds of thoughts that I was going to drop dead, and from that time I developed other thoughts, and I thought then, I having gone there about six weeks, or something like that, at the time, so I had started to feel a lot better, I thought another couple of weeks I would be all well. But it didn't work out that way." So far as the record appears, this witness only paid twelve dollars for membership in the clinic where she listened to lectures, to piano playing, consulted with physicians and psychologists, until she left a dissatisfied patient at the end of about seven months. She testifies that she paid in all about one hundred dollars. The medication which the patients received, commonly called a cocktail, according to Dr. Parks, an inspector for the State Department of Social Welfare, and as testified to by petitioner's witness Dr. Espejo, was a mixture of chloral hydrate, bromide, tincture of capsicum and tincture of digitalis. The proportions are described. It acted as a sedative. In addition Miss Tabin received a prescription from Dr. Espejo. It is not asserted that this was improper treatment for a neurasthenic. Also, there was physical manipulation of the nose and solar plexus region by one of the physicians who, at the same time, told the patient, in substance, to forget her troubles and think of pleasant things.

She has now been under the care of Dr. Srebnik for almost thirteen months and says she feels better.

The license of a physician may be revoked, suspended or annulled when he is guilty " of fraud or deceit in the practice of medicine " (Education Law, § 1264, subd. 2). Several specifications made by the medical board were not approved, but the Regents did approve and find that petitioner was guilty of fraud and deceit in that he " aided and abetted " the Foundation to practice medicine and " one Rudolph Rebold, an unlicensed practitioner, to practice medicine at the Body and Mind Foundation, and aided and abetted the said Rudolph Rebold to hold himself out as a licensed physician and to use the title ' M.D. ' ". Words used in a statute are to be understood in their ordinary import. Fraud and deceit have more than one meaning, dependent upon circumstances and the relations of the parties. A breach of duty irrespective of moral guilt which tends to injure public interest is a constructive fraud. The petitioner cites *People* v. *Mangan [Horvatt]* (237 App. Div. 289, affd. without opinion, 262 N. Y. 508). There the defendants were indicted and convicted for the violation of section 304 of the Penal Law, which provides in substance that a bank director " who makes a false entry in any * * * report or statement of such corporation with intent to deceive * * * any public officer " required by law to examine the bank is guilty of a felony. This court held that gross negligence was not comparable with an intent to deceive. The report signed by the defendants contained false items, but not to their knowledge. There was no direct proof that they had knowledge of the falsity of the report made by them. The opinion states: " It falls far short of the requirements of evidence sufficient to show that the defendants were guilty of intent to deceive or that they were guilty of such failure to inform themselves as to permit the inference that they did know or were willfully ignorant and thus intended to deceive " (p. 299).

The opinion cites the rule from *Constant* v. *University of Rochester* (133 N. Y. 640) that where evidence offered to establish a fraudulent intent is as consistent with innocence as with wrongdoing, the inference of innocence must be drawn. The Attorney-General cites *Ultramares Corp.* v. *Touche* (255 N. Y. 170), a civil case, brought against the defendants, a firm of public accountants employed by Stern & Co. to prepare a balance sheet as of the condition of its business at the end of a given year. The plaintiff loaned money to Stern & Co. in reliance upon the statement and certificate of the public accountants.

It is unquestioned that the statement was incorrect and untrue. The opinion recites entries and discrepancies which were suspicious and which, according to the opinion, " a careful and skillful auditor would have desired to investigate ". A judgment for the plaintiff was reversed and a new trial granted. The nature of the *Ultramares* case makes it less applicable here than the *Mangan* case, but Chief Judge CARDOZO's great ability for clarity and brevity makes pertinent certain of his observations in the opinion.

" Fraud includes the pretense of knowledge when knowledge there is none " (p. 179).

" Directors of corporations have been acquitted of liability for deceit though they have been lax in investigation and negligent in speech. * * * This has not meant, to be sure, that negligence may not be evidence from which a trier of the facts may draw an inference of fraud, * * * but merely that if that inference is rejected, or, in the light of all the circumstances, is found to be unreasonable, negligence alone is not a substitute for fraud " (p. 186).

" Negligence or blindness even when not equivalent to fraud, is none the less evidence to sustain an inference of fraud. At least this is so if the negligence is gross " (pp. 190, 191).

The general rationale of the *Ultramares* case is that a thoughtless slip, or blunder, or the failure to detect a theft or forgery under a deceptive cover, is not tantamount to fraud. In *Matter of Kasha* v. *Board of Regents* (264 App. Div. 925) " fraud and deceit " under the statute here involved were found by the Regents upon proof that one not licensed practiced in Kasha's office, without evidence of the latter's knowledge. This was confirmed by the Appellate Division (*supra*) but reversed by the Court of Appeals as matter of law and the charge dismissed (290 N. Y. 630).

A printed record of slightly more than 900 pages contains the story of petitioner's life as painstakingly developed by the State of New York and certain medical societies, and as thoroughly answered by petitioner and his friends. To sustain the charges, it has been deemed necessary to establish the number of times he has been married; the details of a controversy with a street car conductor in Boston; his identification with the Emmanuel Church clinic and his relations with those of his professors who were interested therein; also with antagonistic professors and the Massachusetts examining board; his 15 unsuccessful attempts to pass the examination to become a physician in Massachusetts, and a fact more

relevant, that while he was connected with the office of his brother, a licensed physician in that State, he was convicted and fined $100 for practicing as a physician without a license. It is unquestioned that petitioner is licensed to practice in Virginia, New Hampshire and New York; that men and women who were identified with the Foundation in its beginning at the church and later up-town, some now dead, were and are highly respected, and their reputations entitle them to an unquestioned belief that they were honest in their interest in this effort to cure imaginary or even real human ills through mental training. Twelve physicians gave support to the petitioner's purity of intent, by testifying, or sending letters which certified to his good reputation and high standing as a physician and psychiatrist. Two character witnesses are from the diplomatic field, each having held distinguished posts. Those from the legal profession include former cabinet members, partners of a present cabinet member, a former governor of Arizona, a partner of a one-time presidential candidate, authors, educators, newspaper reporters and churchmen, all interested in the clinic at the time it was at St. Marks-in-the-Bouwerie and since, also the sister of a former president, the grandson of a former president, the widow of a famous general, and other persons in the public eye.

Petitioner's relations with county and city medical societies have not been cordial, and to their rules he is a nonconformist. Progress is not made by the orthodox, content to travel beaten paths. If it be true, according to the generally popular belief, that the most orthodox of physicians at times treat neurasthenics who enjoy poor health by administering bread pills and sweetened and slightly colored water, the underlying theory back of the Foundation is not different, but only an extension and enlargement thereof, with the addition that Dr. Cowles sought to have the Foundation members do things, so that all their thoughts would not center on real or imagined ailments. Petitioner was told that the work of the clinic did not amount to the practice of medicine. There was no unjust or illegal enrichment. The proof does not show that petitioner was guilty even of constructive fraud in connection with the Foundation.

As to the Rebold charges — letters were received in evidence written between 1937 and 1940 by five physicians other than petitioner, each showing that they believed Rebold to be a regularly licensed physician; one by a physician connected with the Hospital for Ruptured and Crippled, giving notice

of a staff meeting, stating, *inter alia,* " Subjects for discussion will be: 1. Progress of Sulphur Therapy in this Clinic — Dr. G. B. Lilly and Dr. Rudolph Rebold "; one addressed to Dr. Rebold by a physician inviting him to read a paper " regarding the result of your sulphur treatment of arthritis patients "; notice of a meeting of the arthritis clinic at the Hospital for Ruptured and Crippled " at which Dr. Rebold will discuss sulphur metabolism in arthritis "; a letter recommending " Dr. Rudolph Rebold " to Montgomery Ward, reciting Dr. Rudolph Rebold's work " in the Arthritis Clinic of the New York Ruptured and Crippled Hospital " for about four years and concluding, " I found him very competent, honest and endowed with a very pleasing personality. I would certainly highly recommend him for any work he might undertake for you "; two other letters, one from a physician and another from a nurse, dealing with sulphur metabolism. Rebold was introduced to petitioner by a Dr. Donnet, with an office at 57 West 57th St., New York City. Dr. Donnet had introduced Rebold to others, including the " Rikers Island Hospital ". Rebold was a subscriber to the Journal of the American Medical Society. The Journal was addressed " Rudolph Rebold, M.D., 11 W. 42nd St., Times Square, New York, N. Y." He left a copy of the Journal so addressed in Dr. Cowles' office. His automobile carried an M.D. license from the State of New York " 3MD 390 " for the year 1940. A practitioner of the law would hardly carry with him a certified copy of his certificate of admission when calling upon an attorney for the first time. Courts do not require a practitioner to exhibit a certificate before engaging in a trial. The petitioner was justified in believing that Rudolph Rebold was a licensed physician and he was not guilty of fraud and deceit in permitting him to work at the Foundation.

The decision of the Board of Regents should be annulled and the charges dismissed, on the law.

All concur.

Decision annulled and the charges dismissed, on the law, with fifty dollars costs and disbursements.