In the Matter of LEE R. TOMPKINS, Petitioner, against BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK, Respondent.

Third Department, November 10, 1948.

*Albert T. Decker,* attorney (*Bliss & Bouck* of counsel), for petitioner.

*Nathaniel L. Goldstein, Attorney-General,* for respondent.

RUSSELL, J. This is a review of a determination of the Board of Regents of the State of New York which found Dr. Lee R. Tompkins of Liberty, New York, guilty of fraud and deceit in the practice of medicine within the purview and meaning of paragraph (a) of subdivision 2 of section 1264, now paragraph (a) of subdivision 2 of section 6514 of the Education Law of the State of New York.

The review of this proceeding becomes perplexing because of the two divergent theories taken by the petitioner and the respondent on this appeal.

The petitioner states that " the alleged fraud and deceit attempted to be proven against Dr. Tompkins was the unlawful issuance of prescriptions for narcotic drugs in violation of the Harrison Narcotic Act, a Federal Statute." He contends that by the wording of the charges laid under the Education Law the violation is tied in with the wording of the Harrison Narcotic Act. (Internal Revenue Code, ch. 23, § 2554, U. S. Code, tit. 26.)

The respondent contends that the charges laid under the Education Law do not refer to the Harrison Act. That they refer to " fraud or deceit in the practice of medicine within the purview and meaning of Section 1264, Subdivision 2(a) of the Education Law ". The respondent further contends that " on the contrary, they tend to tie into the Public Health Law, Article 22, ' Uniform Narcotic Drug Act ' ", which expressly deals with " fraud or deceit " in section 438, and which provides as follows in subdivision 1 of section 427: " A physician or a dentist, in good faith and in the course of his professional practice only, may prescribe, administer and dispense narcotic drugs * * *."

To review this case properly this court must necessarily proceed to review the acts alleged to be in violation of paragraph (a) of subdivision 2 of section 6514 of the Education Law.

Neither the Harrison Act nor the Public Health Law is mentioned in the charges. The wording of the charges might possibly carry the violation into the Harrison Narcotic Act and also into the Public Health Law, but since neither is mentioned in the charges this court will confine itself to a violation of paragraph (a) of subdivision 2 of section 6514 of the Education Law. Had the violations been within either of these laws then the charges should have expressly so stated.

Subdivision 2 of section 6514 of the Education Law which is the section alleged to have been violated, reads as follows:

" 2. The license or registration of a practitioner of medicine may be revoked, suspended or annulled or such practitioner reprimanded or disciplined in accordance with the provisions and procedure of this article upon decision after due hearing in any of the following cases:

"(a) That a physician is guilty of fraud or deceit in the practice of medicine or in his admission to the practice of medicine;  *  *  *."

Dr. Tompkins is charged with unlawfully supplying narcotics by the issuing of prescriptions to one James Succo, although he knew or should have known that James Succo was addicted to the use of narcotic drugs, and that he did so prescribe not in good faith and in the regular course of his professional practice. The doctor is also charged with having unlawfully supplied narcotics by the issuance of prescriptions to William Schlossberg, alias William Salsburg, Harry Stevens and Alex Zisk, although he knew or should have known that none of said persons were in legitimate need of narcotic drugs, and did so not in good faith and in the regular course of his professional practice in the care and treatment of said patients.

Zisk, who was well known to the Federal Bureau of Narcotics as a nonmedical addict, called on Dr. Tompkins in August, 1944, for medical treatment. At that time he complained to the doctor that he had a very severe pain in his side and had been under treatment by a New York physician who had taken X rays and was expecting a call to go to the hospital for a kidney operation. The doctor prescribed morphine to relieve him of pain and issued three prescriptions to him. These were issued from August 22d to September 5th. On a subsequent visit the doctor refused to treat him further or to give him a prescription. Zisk complained to the Federal Bureau of Narcotics that " he had been purchasing prescriptions from Dr. Tompkins for $7." The grievance committee found that the evidence was insufficient to warrant a finding of fraud or deceit with

regard to the patient Zisk upon the basis that the doctor had prescribed only three times for this patient.

Three witnesses were presented against the doctor who had obtained prescriptions, namely, Succo, Schlossberg and Cross. Succo, Schlossberg and Cross were in the employ of the United States Treasury Department, Bureau of Narcotics. Succo, who was an addict and an informer, obtained seven prescriptions from the doctor from November 6th, until December 14th. About eight days later Succo returned for another prescription but was refused by the doctor. He obtained these prescriptions from the doctor through a false story that he was a merchant seaman and while carrying war supplies to Murmansk had been torpedoed and suffered in the icy water for a long time. He also stated that he had been rescued and received serious injuries by showing scars on his leg in substantiation of these facts. At the time he entered the office of the doctor, he was breathing very hard and was jumpy. Succo also told the doctor that morphine was the only thing that helped him. Succo next returned on December 5th being accompanied by one Schlossberg. At this time, Schlossberg gave a false name to the doctor and told the doctor that he was addicted to narcotic drugs. The doctor understood through Succo that Schlossberg was his shipmate and was to return to his ship shortly. The doctor was also of the belief that Schlossberg had been through the same experiences as Succo. Schlossberg received three prescriptions from the doctor and at the time of the issuance of the last prescription was refused any more.

Cross, who was a Government agent, obtained two prescriptions from the doctor. He obtained them through a false story by relating that he was travelling with a circus, that he was in need of medication and wanted a prescription until he arrived home where his doctor would take care of him. On his second visit the doctor refused to prescribe for him, but on the third visit he obtained a prescription for $5.

The evidence in the case shows that on or about July 25th Stevens came to the doctor's office and related to him that he was working at one of the large Sullivan County hotels and needed morphine to check a bad cough in order that he might work. He obtained from the doctor several prescriptions for forty quarter grain tablets and on several occasions from July 25th until December 16th, two on the same day. In approximately eight days he obtained prescriptions for one hundred quarter grain tablets during that period. These prescriptions were acquired by Stevens, who related his history of being ill

for several years with bronchitis and pulmonary tuberculosis. He also stated that he had been in a sanitarium; had X rays taken and that there was a positive sputum test. He also related that he used sedatives during his hospitalization. Upon this history of the case the doctor took an X-ray picture of the patient's chest and also fluoroscoped him. The X ray showed increased bronchial markings in the hylar area. The doctor's physical examination revealed increased bronchial breath sounds, occasional sonorous and hissing rales.

In examining the evidence it is the duty of the court to see if the number of prescriptions issued, the malady for which they were issued and the circumstances under which they were issued convince one that it was the practice of the respondent to issue prescriptions for a monetary consideration without a reasonable ground for believing the issuance necessary.

Succo, who was an addict and an informer, and Schlossberg who told the doctor he was an addict, both told stories of possible belief that were interwoven with a patriotic color. Morphinism being a disease the doctor had a right to prescribe for them. The number of prescriptions issued to each one did not warrant any finding of fraud or deceit in the practice of medicine. The fact that, after a limited number of prescriptions was granted to each of these men, the doctor refused any more prescriptions is convincing that the doctor was not engaged in the general practice of granting the request of patients who claimed to be addicts. It is impossible in the cases of these men to conceive where there was any intent upon the part of the petitioner to violate the Education Law. In actual fraud or deception the essential element is the intent to defraud and deceive. (*Chaddock* v. *Chaddock,* 130 Misc. 900, 904; *Lefler* v. *Field,* 52 N. Y. 621, 622; *Costello* v. *Costello,* 209 N. Y. 252, 258.)

The two prescriptions issued to Cross raise a more serious question because of statements made by the doctor himself, and the disease " renal colic " which he wrote not only on the prescriptions to Cross but also on the prescriptions to Schlossberg which he knew to be untrue. This was a thoughtless and unwise act, but upon surveying his entire field of activity in his profession, there does not appear to be a deliberate intent to defraud or deceive the State, or to injure the public in his medical practice.

Stevens was his patient and according to the evidence was a proper subject for morphine treatment. His acts in issuing prescriptions to Stevens were acts in good faith for the purpose

of relieving not only his patient on account of his physical condition, but also for conditions incident to his patient's addiction. Although the prescriptions issued to said patient appear to be many, still there is no evidence to show that the number granted were not in accordance with fair medical standards and in an amount necessary for the relief of said addict. This being so, the doctor was acting in good faith and had a right to issue them. (*Linder* v. *United States*, 268 U. S. 5, 18.)

The doctor practiced in the village of Liberty, Sullivan County, where he spent most all of his life. He graduated from Syracuse University where he studied arts and medicine. From there he served an interneship in the State of Michigan and had an active rural general practice. On moving to Sullivan County he became one of the four coroners, a trustee of the village and then was elected mayor, which office he resigned because of war work which occupied his time as an examining physician of the local draft board. It appears that he was local health officer in Sullivan County; a member of the Sullivan County Medical Society; New York State Medical Society and a Fellow of the American Medical Association. A man's reputation and activities in his profession for years are of value in considering whether or not his acts were in good or bad faith when accusations are made against him. Considering his unblemished reputation in the practice of medicine for years and the number of prescriptions of morphine he issued, it is clear that he was not engaged in the practice of issuing prescriptions for morphine for a monetary reason and that there was no intent on his part to defraud or deceive the State.

The determination of the Board of Regents should be annulled, on the law, and facts, with $50 costs and disbursements.

Deyo, J. (concurring opinion). The respondent bases its entire case on the premise that "fraud or deceit in the practice of medicine" found in paragraph (a) of subdivision 2 of section 6514 of the Education Law has the same breadth of meaning as "unprofessional conduct," listed as a ground for discipline in other professions. I find no authority for ascribing such an all inclusive meaning to the phrase, at least insofar as it applies to the facts of the instant case. Fraud or deceit under the Education Law contains the same elements and must be established by the same rules as under any other statute. (*Matter of Cowles* v. *Board of Regents*, 266 App. Div. 629, affd. without opinion, 292 N. Y. 650). Although, as was pointed out by Mr. Benjamin, one of the members of the Regents' Committee on

Discipline, in his dissenting report, the petitioner may have been guilty of other professional peccadillos, the respondent has not sustained the burden of proving any deliberate intent to defraud or to deceive anyone. The determination of the Board of Regents should be annulled on the law, and the charges dismissed.

HILL, P. J., HEFFERNAN and BREWSTER, JJ., concur with RUSSELL, J.; DEYO, J., concurs in a separate opinion.

Determination of the Board of Regents annulled on the law and facts, with $50 costs and disbursements.